## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

INSTITUTO DE EDUCACION UNIVERSAL

V.

98-2225 (RLA)

U.S. DEPARTMENT OF EDUCATION

---

### MOTION FOR NEW TRIAL OR AMENDMENT OF JUDGMENT

To the Honorable Court (HC):

Comes now the Co-Plaintiff, Angel Ruiz Rivera (ARR), appearing here Pro Se, and respectfully states, alleges and prays as follows:

On October 26, 2004, this HC issued an Order Granting Summary Judgment for the Department of Education (DE or USDE) in all claims. Immediately after such Order was issued the legal representative for the Plaintiffs; Instituto de Educacion Universal (IEU) and Angel Ruiz Rivera (ARR), filed for resignation. This District Court did not accept that resignation. On its Omnibus Order of December 7, 2004, it ordered: "Plaintiff IEU is ordered to appear through new counsel on or before February 11, 2005. In the event it is unable to do so, IEU shall submit, on the same date, an affidavit by an officer of the corporation documenting all the good-faith attempts to secure legal representation. That is precisely what ARR did on February 10, 2005, and this Court accepted by granting its March 1, 2005 Order (Docket #80). The Defendant did not timely oppose that Motion To Comply With Court Order Of December 7, 2004 and belatedly on March 14, 2005, filed another of its ill-attempts to railroad this cause of action based on falsities that somehow have been given credit by this Court. All this without giving us the

1

opportunity to even receive the motion much less to respond to it. This time the pretense is not only to railroad us for the third time and prevent that we have *a fair day in court* after more than ten (10) years facing the abuse of power under the color of authority of so many federal officers, but now the abomination goes a little further and they pretend that you forfeit our right to appeal. In any event since the March 16, 2005 Order of this Court constitutes its last order, we are hereby filing this Motion requesting a new trial or amendment of the judgment pursuant to Federal Rule of Civil Procedure (FRCP) 59 (e).

We must start by stressing that the Defendant has repeatedly induced this Court into error by alleging that because ARR withdrew his appeal on his personal basis from the second time this case has been before the Circuit Court (99-1628), that should be equated to his cessation as a party in the instant case. Nevertheless, it was ARR, not IEU, the party who retained the services of Schuster Usera & Aguilo to represent IEU and himself in the re-filing of this Complaint at the District Court when also due to the Defendant's dilatory tactics, this Court did not take the remanded Complaint as the Complaint for purposes of the instant case and forced both Plaintiffs to re-file the Complaint of this supposed judicial review of the final agency decision for the third time. It is simply preposterous to pretend that ARR, the promoter of this litigation since its onset, may hire, pay and owe IEU lawyers and have them exclude his own personal interests from the instant case.

Elsewhere, we have expounded on why ARR cannot be disengaged from IEU since first IEU was decertified as a corporation since August 1998. Second, ARR was the signatory of the Program Participation Agreement (PPA) with the USDE, the contract that the Plaintiffs' claim that the Defendant breached through the actions challenged in the instant "judicial review".

2

Third, ARR was held responsible for IEU by both the USDE and the U.S. Department of the Treasury. Fourth, ARR still faces the possibility of debarment personally by the USDE depending upon the final outcome of the instant case. Fifth, ARR has been retaining, paying and owing on his personal basis, the legal honoraria for both himself and IEU.

As to the merits of this Motion we must start by highlighting that in this Court's Order of October 26,2004, there are a myriad of contested facts that were labeled as uncontested and of uncontested facts that were neither contested nor placed in their proper perspective, reasons why the instant case is not ripe for summary judgment for the USDE and if at all, as this HC will corroborate, it is for the Plaintiffs. We will first address the "Facts", as per this HC's opinion, making reference to the specific number used by this HC, but in the order of relevance and pertinence to our arguments.

1) The HC ruled that it was an uncontested fact that:

> 20) " **On March 12, 1996,** USDE notified Plaintiff of its intent to **terminate** the school's eligibility to participate in the Title IV programs and to fine it $275,000 for the programmatic violations identified in the program review and audit."
> 21) "Plaintiff appealed the termination and fine actions on **April 1, 1996.**"

The Plaintiffs do not object this determination of fact since it is correct. What the Plaintiffs do object is what the HC perhaps inadvertently omitted about this fact, which is what is significant so that the facts are put in proper perspective. To start, the HC fails to recognize the also undisputed fact that the Plaintiffs' appeal was timely filed. This undisputed fact is pertinent and relevant for reasons that will become clear below. Very respectfully, the above undisputed fact must be evaluated together with the following undisputed facts:

> 13) "On June 28, 1996, SFAP issued a Final Audit Determination (FAD) based on the OIG final audit report covering the 1991-92, 1992-93, and 1993-94 award years."

3

15) "Plaintiff appealed the FAD on **August 12, 1996**".

**Again, the HC fails to recognize that this appeal was timely filed.**

18) "On **June 3, 1996**, SFAP issued a Final Program Review Determination (FPRD) that assessed liabilities for the refund finding in the amount of $720,386, to include $655,554 for Plaintiff's failure to make 512 refunds during 1994-95."
19) "On **July 17, 1996**, Plaintiff appealed the FPRD."

**Again, the HC fails to recognize that this appeal was timely filed.**

(22)  "The USDE's hearing official consolidated all three administrative actions involving Plaintiff."
(23) "An administrative hearing was held in San Juan, Puerto Rico, in **October 1996.**"
(24) "The hearing official issued his decision on **January 24,1997**."
(25) " The hearing official affirmed the excess cash finding and the refund finding and assessed the associated liabilities. **He reversed the clock hour finding in part**, and reduced the amount of the time to $150,000. The hearing official terminated Plaintiff's Title IV eligibility.
26) "**Both parties appealed** the hearing official's decision to the Secretary."
27) " In the final agency action, issued on **October 28, 1997**, the Secretary affirmed the hearing official's excess cash and refund findings, but reversed the hearing official's clock-hour finding. Reinstating the full liabilities. The Secretary sustained the amount of the fine, **but reversed Plaintiff's Title IV eligibility termination.**"
28) "The Office of Student Financial Assistance (SFAP) filed a motion for reconsideration that was denied on **January 9, 1998**."

The pertinence and relevance of all the above undisputed facts are the following:

1) The HC does not explains nor could it, simply because the USDE did not, how could

the USDE had initiated on March 12, 1996, a termination action against IEU, when at this

juncture, its administrative actions were obviously not final since the FAD and the FPRD had not

even been issued (**June 28, 1996 and June 3, 1996**). Evidently this is a blatant violation of

IEU's constitutional procedural due process guarantees under the Fifth Amendment, the statutory

provisions of the Administrative Procedures Act (APA) (5 U.S.C.) and the regulatory provisions

under 34 Code of Federal Regulations (C.F.R.) for Education. When the FAD and FPRD were

finally issued, they were both timely appealed as we have seen. Thus, they never became final much less firm. Notwithstanding this, extremely punitive and pre-confiscatory actions were taken against IEU, even before its FAD and FPRD were final, and before IEU had availed itself of its constitutional, statutory and regulatory rights to respond, have a due process hearing and request this judicial review through appeal.

2) This blatant violation of the Plaintiffs' constitutional procedural due process guarantees, statutory and regulatory provisions is more than significant due to the undisputed fact that **the Secretary in his final agency decision, on October 28, 1997, revoked his hearing official's decision to terminate the Plaintiffs' eligibility**.

3) This undisputed fact is even more significant when you consider that the **Secretary affirmed his decision on January 9, 1998, not to terminate the Plaintiffs' eligibility** even when its own Office of the Inspector General (OIG) and Office of the General Counsel (OGC) Chief Counsels, both, joined in a Motion for Reconsideration (just as the Plaintiffs also did, a fact that is not recognized) of this Secretary's final agency decision, only to be denied once again.

4) The problem with the above, is how can this HC or any for this matter, justify the obviously unripe and consequently unconstitutional and pre-confiscatory termination action of the Plaintiffs' eligibility by the Defendant's as of March 12, 1996, when: 1) Not even the FAD nor the FPRD had been issued; 2) the Plaintiffs' timely responded and appealed both, consequently impeding that they became final; 3) the Administrative Law Judge (ALJ) eventually ruled against the USDE in terms of the FAD "clock-hour finding", the one with the highest monetary liability imputed; 4) even when the Secretary reinstated it, he revoked that same termination for "lack of evidence of intentional wrongdoing" (See October 28, 1997, Secretary's

5

Decision at p.8, affirmed on January 9, 1998, Final Decision); and, 5) even when its OIG and

OGC Chief Counsels moved for reconsideration, the agency's highest authority, the Secretary,

affirmed that the unripe termination was definitely and ultimately "unwarranted for lack of

evidence of intentional wrongdoing".

    5) The above undisputed facts are pertinent and relevant because they serve to prove

without any doubt, that the actions taken by the Defendant against the Plaintiffs' were not only

premature and consequently unripe, but that eventually they never prevailed in terms of the most

significant issue at stake here which was undoubtedly termination. The pertinence and relevance

of the above undisputed facts, omitted altogether by this HC in its opinion, is that the USDE also

prematurely initiated punitive and pre-confiscatory actions against the Plaintiffs, relying on the

above "termination" which eventually never became final, much less was it at March 12, 1996,

when it was initiated, a time when the FAD and the FPRD had not even been issued. The above

mentioned actions occurred when the USDE: 1) unilaterally and in breach of the contract it had

with IEU, The Program Participation Agreement (PPA) switched it to the reimbursement method

of payment, also without any due process and subsequently took additional retaliatory measures

against IEU when: 2) it predeprivated and preconfiscated the Plaintiffs' of all the funds owed to

it through the reimbursement requests that had been systematically and deliberately delayed in

disbursing to start with, by effectuating an illegal and confiscatory taking of property through a

clearly unripe Notice of Offset on February 7, 1997 [after IEU had filed an Injunctive Relief

Petition and Complaint against the USDE on July 23, 1996 at this same court, 96-1893 (JAF)].

See Notice of Offset at p. 2 where it affirms that the extreme measure was taken based on the

"termination" decision of the ALJ. "Termination" that we all know that eventually never came

6

into being since it was overruled by the Secretary.

6) This undisputed fact is significant because in addition to the obvious, that the USDE did not have a legal right to pre-confiscate more than $2.263 million dollars owed to IEU students, faculty and employees, (and still owes, since the USDE still does not have a final decision as of yet), by asphyxiating economically IEU totally, it left IEU without even the possibility of being able to retain and pay counsel to defend itself from all these clearly unripe unconstitutional and illegal actions since it left it totally devoid of financial resources. This is one of the reasons why IEU was obliged to appear through its President, Pro Se, in various stages of this litigation since the onset, starting at the administrative hearings level.

7) Actually, because as we all know, the decision of this court is still not final, as we intend to appeal it if this reconsideration is not successful, we are respectfully requesting from this HC to order from the USDE the immediate release of all the pre-confiscated funds so that IEU can have the financial resources to avail itself of its right to representation by counsel of its choice, a right that was predeprived from it by the USDE by the taking of all its property without evidently complying with basic due process. We request that from these funds, the debt owed to the previous lawyers that have represented IEU in this litigation are paid, just as the present and future ones, until this judicial review process is final and over, including any future counsel that this HC may choose to appoint for IEU due to its insolvency and the determination of this HC that its President, Angel Ruiz Rivera (ARR) cannot represent it Pro Se. This, in case my appearance for IEU is not accepted or I am forced to eventually resign for whatever reasons not excluding my inability to pay for my legal services. In the alternative, we pray that this HC appoints a judicial administrator of these funds who would pay the legal honoraria, fees and

7

costs and any other incidental cost of this litigation and any other expenditure that this HC may

in time approve.

8) Very respectfully, we are also requesting that this HC orders the Internal Revenue

Service (IRS) of the U.S. Department of the Treasury (USDT) to enforce its Notice of Lien

against the USDE funds owed to IEU, since this credit to the IRS has preference in rank and in

time over any credit that the USDE may eventually have in case it ultimately prevails. It is a

preferred credit in rank and time because it is attached to the social security or FICA payments of

the hundreds of IEU workers that were not paid for the quarters of October-December 1995,

January -March 1996 and April - June 1996 as a result of the unconstitutional and illegal

precofiscation of those funds owed to IEU by the USDE. Since this credit is older that anyone

that the USDE may eventually have, the old maxim "first in time-first in right" applies to it.

9) The above "unwarranted" termination action according to the Secretary, in addition to

having violated IEU's procedural due process guarantees under the Fifth amendment, also

constituted a violation of IEU's substantive due process guarantees.[1] The text itself of the

termination letter serves to illustrate why. While some officials of the USDE were claiming that

according to their subjective interpretation of the clock hour regulation, a clock hour obligatorily

had to be 60 minutes in length, contrary to the unambiguous text itself of the regulation per se

---

[1] In DANIELS v. WILLIAMS, 474 U.S. 327, the Court reminded us that: "This history reflects traditional and common-sense notion that the due process clause, like its forbear in the Magna Carta, see Corwin, The Doctrine Of Due Process Before The Civil War, 24 Harvard Law Review, 366, 368 (1911), was " intended to secure the individual from the arbitrary exercise of the powers of the government" Hurtado v. California, 110 U.S. 516, 527 (1884). And in his concurrent opinion, Justice Stevens reminds us that: **"Second, it contains a substantive due process component, sometime referred to as "substantive due process"**, which bars certain arbitrary government actions "regardless of the fairness of the procedures sued to implement them." (Citations). The above reminders are of definite application to the instant case.

which specifically provided for a range of "50-60 minute", some other officials were claiming

something substantively different. Part of the text of the Letter of Termination of March 12,

1996, at p.7-9, is a good example of this disparate treatment of this issue within the own agency.

See Memorandum of Law In Support of Summary Judgment at p.16 from where we import:

> " The revised regulation became effective on September 7, 1993. Under the regulation,
> the following are acceptable methods for institutions to structure periods of instruction:
> **(1) INSTRUCTION FOR 50 MINUTES with no preceding or subsequent classes is
> acceptable as one clock hour of instruction;** ...
> **(3) INSTRUCTION FOR 50 MINUTES** with no preceding class, followed by 10
> minutes of non-instructional time with subsequent classes **50 minutes in length, each
> followed by 10 minutes of non-instructional time, is an acceptable schedule.** Each 50-
> minute period would total a clock hour.
> **(4) INSTRUCTION FOR 50 MINUTES** with no preceding class, but with a subsequent
> class of instruction immediately following, is an acceptable schedule. However, 10
> minutes of non-instructional time must follow the second class and all subsequent classes.
> **In this instance, each 50-minute period would total a clock hour.** This is acceptable
> because non-instructional time precedes the beginning of the first class. Thus, under the
> regulation, the first two periods of instruction may run consecutively."

As can be corroborated, it is evident from the text above written by the Compliance and

Enforcement Director of the USDE, that a clock hour could be a 50 minute period, after all,

whenever he or the USDE felt like it. As this HC may concede or not, it simply does not get more

arbitrary, capricious, an abuse of discretion and not in accordance with the law and its own

regulations than this. "The fact that an administrative agency construction has not been uniform

and consistent may lead a court to give it little or no effect in determining the true meaning of the

statute." De Sylva v. Ballentine, 351 US 570. "All rulemaking authority delegated to

administrative agencies is limited." Bowen v. Georgetown University Hospital, 488 US 204. "

Administrative agencies may not act arbitrarily and capriciously in the enactment of rules and

regulations in the exercise of their delegated powers." Thompson v. Consolidated Gas Utilities

9

Corp., 300 US 55.

The requirement of reasonableness of an administrative regulation means no more and no less than that the regulation must be based upon reasonable grounds." American Trucking Association v. United States, 344 US 298. "There is authority that an agency rule is arbitrary and capricious if the agency relies on factors Congress has not intended it to consider, entirely fails to consider an important aspect or problem or offers an explanation for its decision that it is so implausible that could be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Auto Insurance Co., 463 US  29.

Besides the fact that its own Office of the General Counsel (OGC) expert lawyer had issued a legal opinion against this interpretation; besides the fact that the IRB Chief Auditor had issued a Policy Memo against it, ordering its auditors "not to cite" this finding nor "take any action" in scenarios such as IEU's; besides the fact that it had been rejected by the USDE- ALJ in the case In The Matter of Denver Paralegal Institute; besides the fact that the USDE-ALJ had rejected the latest amendments to the regulation and the "clarification" in the preamble of the Federal Register, in the case In The Matter of MBTI, rejection which was issued **before** IEU's OIG audit and program review and affirmed by the Secretary **before** the issuance of IEU's FAD and FPRD; besides the fact that the Quality Assurance Review Team Report (QARTR) of the USDE-OIG rejected the application of this interpretation to IEU's scenario; and besides the fact that the USDE ALJ in IEU's case also ruled against the USDE regarding this issue; the "patent absurdity" [2] of the above "acceptable methods", when the USDE had no business getting into the recesses or breaks of the institution's schedules, convert this action by the USDE, into the

---

[2] See Justice Scalia's concurrent opinion in INS. v. Cardoza-Fonseca, infra.

10

epitome of arbitrariness and capriciousness. See Memorandum, supra at p.9.

The USDE'S recalcitrance in making an issue out of this, (the breaks or recesses making up the non-instructional time) clearly violated statutory provisions that expressly prohibit such non-sensical pretense. This was reiterated by the ALJ, In The Matter Of IEU on page 6, of its decision:

" IEU justifies its method of determining clock hours by explaining that since its day students receive 300 minutes of instruction a day, and the increments of instruction are divided into 50-Minute periods, it is only natural to divide the total number of minutes of instruction by 50 to arrive at the proper number of clock hours. It is adamant about not including non-instructional time in the clock-hour computation because to do so would result in a higher fee for its students....

SFAP'S failure to include the 50 minutes of non-instructional time IEU allows each of its day program students, and the 20 minutes of non-instructional time for the night students, in the computation of the program's clock hours suggests that the Department is interested in preventing a school from providing a continuous stream of 50 minutes lectures, without the benefit of a break. Perhaps this is premised on the concern for the value of such non-stop class time. If the non-inclusion of non-instructional time in the clock hour computations is based on this theory, then **this appears to be a venture by the Department to exercise direction or control over IEU's curriculum or program of instruction, which is expressly prohibited.** 20 U.S.C. § 3403; See also 20 U.S.C. §§1232-A,5899. The arrangement of instructional and non-instructional class hours is not a Departmental concern, but one within the province of a state licensing body or accrediting agency.

Consequently, if a reviewing court's interpretation of a statute is more in keeping with the intent of Congress than the administrative construction, the administrative construction is not entitled to substantial deference. INS v. Cardoza-Fonseca, 480 US 421. The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress, KMART Corp. v. Cartier, Inc., 486 US 281, and the judiciary must reject administrative constructions which are contrary to clear congressional intent, Chevron United States v. Natural Resources Defense Council, Inc., 467 U.S. 837, such as where the legislative history or the purpose and structure of the statute clearly reveal a contrary legislative intent.

11

Chemical Manufacturers Association v. Natural Resources Defense Council, Inc., 470 US 116.

10) At page 9 of its opinion this HC states: "As a result, some schools, including Plaintiff, determined the number of clock hours in their program on instruction by aggregating the number of minutes of instruction and dividing the program by fifty (50)". **This is not correct at least in IEU's case.** What some officials at some schools did, specifically excluding Plaintiffs', was to aggregate all the minutes that the students were supposed to be in the school day, (or night for that matter), and divide that total by 50 minutes. The difference in the equation is not as subtle as it may seem. Minutes in the school day and minutes of instruction are two different things. Since in the minutes during the school day or night, all recesses or breaks are an integral part of those minutes, this gross amount of minutes divided by periods of 50 minutes, arithmetically left the school charging for non-instructional time. **This is precisely what the Plaintiffs' did not do.** That is why it did not take into consideration nor charged for non-instructional time as recognized by the own OIG Draft and Audit Reports. IEU divided by periods of 50 minutes once it had already subtracted from the gross amount of minutes during the school day or night, the net minutes of instruction. Thus, since IEU had already netted the minutes of instruction from the minutes of attendance in the school day or night, IEU did not overcharge for a single hour for any of its students. See Memorandum, supra at p.10-20.

The following quote summarizes the way that the own experts within the expert agency argument the above in their Quality Assurance Review Team Report (QARTR) [3] after they

---

[3] The QARTR has always been denied to IEU by the USDE in an overt obstruction of justice. It is, as its name suggests, a report by the experts of the USDE-OIG paid to perform audits of the OIG audits for quality assurance purposes. The few, but nonetheless revealing

12

audited the OIG audit of IEU and rejected its findings:

> "-IF THE SCHOOL SCHEDULE IS 8:00-8:50, 9:00-9:50, 10:00-10:50, 11:00-11:50, 12:00-12:50, AND 1:00-1:50--A STUDENT ATTENDS FOR 300 MINUTES OF INSTRUCTION AND HAS 50 MINUTES OF BREAKS. ED WOULD AGREE THAT THE STUDENT WOULD BE CREDITED WITH SIX CLOCK-HOURS OF INSTRUCTION.
>
> **THEREFORE, WHY SHOULD ED TAKE THE POSITION THAT A STUDENT WHO ATTENDS FROM 8:00-11:20 AND 12:10-1:50, THEREBY RECEIVING 300 MINUTES OF INSTRUCTION AND HAVING 50 MINUTES OF BREAKS, SHOULD BE CREDITED WITH ONLY FIVE HOURS OF INSTRUCTION?** AN ALJ COULD HAVE SERIOUS PROBLEMS WITH THIS CONCEPT. [4]

Plaintiffs' are definitely in no position to second guess the Secretary's regulation and

interpretation authority. What Plaintiffs' are adamantly and vigorously reiterating is that the

application of the interpretation to Plaintiffs' case was wrong since the outset, just as this same

application of the interpretation was found to be wrong in all cases prior to Plaintiffs'and

rejected, according to the stare decisis of the ALJ's of the own agency regarding this issue. See In

the Matter of Denver Paralegal Institute, Complaint at p.28. In The Matter of MBTI, the ALJ

rejected the amendment to the regulation effective September 9, 1993, and specifically rejected

the "clarification" in the Preamble of that Federal Register. Complaint at p. 28-29. That same

stare decisis was used by the ALJ in Plaintiffs'case, who incidentally was a different one, and

also defeated USDE's position. Moreover, ALJ O' Hair accurately described the basis for

Plaintiffs'choice of allocation for the breaks. Complaint at p.33-34, ¶ 66.

---

excerpts introduced as evidence were imported from the proceedings at the U.S. Merit System Protection Board where OIG Auditor-In-Charge recurred once was expelled from the USDE.

[4] In the letter of January 17, 1997 to Mr. Guido Piaseci, Regional OIG Director, by OIG Auditor-In-Charge, Rafael Nater, who was expelled from the USDE after this audit, confessed that:
" I feel the Secretary do have a valid point to defend. **However, it is obvious from a legal standpoint, that the issue is in favor of the school."**

In many institutions which offer classes which cover a two, three of four block of time in one session, designed with 10- minute breaks for each hour, the instructor and students frequently decide to reallocate the 10 minute break periods. This is accomplished by aggregating them in the middle, or at the conclusion, of the class session. The obvious benefit to the choice of the latter option is that the class ends early and the non-instructional period is taken after the students and faculty have departed the facility. This, or any other form of realignment of the non-instructional periods does not deprive the students on any instructional time, as the student has had the benefit of several 50 minute periods of instruction and several 10 minute periods of non-instructional time.

11) We have already seen how by the time the regulation became effective both the fiscal and academic years were running. How and why could this apply retroactively to IEU? How can an accredited, eligible and certified institution, in good standing, could had been destroyed by applying to it wrongfully an interpretation of a regulation that according to its own expert lawyer at its OGC did not need interpretation to start with because it was unambiguous on its face and it was approved with the avowed intention for providing institutional flexibility. How can this judicial review validate a decision that did not add or subtract a minute of the real net instructional time of each student? How can a Court of Law ratify a liability imputed for an interpretation of a regulation that was absolutely misapplied to the Plaintiff's situation and all the hard evidence in the instant case demonstrate this without a doubt? Why is this Court of Law persuaded that this absurd interpretation rejected by all USDE ALJ's prior and after Plaintiff's case, should be given retroactive effect? If this Court's decision were to stand as it is, IEU would be the first and only case in the history of the USDE to be penalized and found liable for obeying its rules and regulations according to how their experts within the agency including their ALJ's had decided. For this reason only, without more, this Court should alter its judgment at least in

this vein.[5]

## THE EXCESS CASH ISSUE

To this point in time we must confess that it does not comes as a surprise to see Court orders that contain excerpts that resemble the Defendant's arguments so closely, sometimes even a d verbatim, that the line that should divide both becomes more and more blurred as time and circumstances evolve and transpire. In regards to this issue, we produced hard evidence that showed without a doubt:

1. That the average monthly excess cash amount on which the liability was so grossly inflated that it was a mathematical impossibility. The results of the deliberate auditor's inflation was outrageous that the monthly average excess cash amount imputed almost doubled the average monthly total cash received. That is how stupid and absurd the Defendant's posit is in this vein and now we must accept that an Honorable Judge with ample experience precisely in bank matters (Banco Credito y Ahorro Ponceno under the Presidency of Angel Rivera, R.I.P.) may endorse or condone such a brutality.

2. We produced audited financial statements by two real independent Certified Public Accountant (C.P.A.) firms, plus uncontroverted expert witness testimony at the administrative procedures that clearly controverted this genuine issue of material fact in controversy.

3. We produced hard evidence that the experts at the agency, the members of the Quality

---

[5] Actually, at page 11 of this Court order it erroneously states that: "They both concluded on behalf of USDE that it was not" when we all know that the ALJ ruled this issue in our favor)

Assurance Review Team of the USDE-Office of the Inspector General (OIG), not only

denounced that this finding was flawed, without logic and unsupported by the working papers but

they went as far as chastising the Auditor In Charge for his audit.

    4. We produced hard evidence that demonstrates without a doubt that in addition to the

above, the AIC, a C.P.A. and lawyer with many years as a federal auditor was expelled from the

OIG after and partially as a result of his flaws in our audit. We cited all the cases at the U.S.

Merit System Protection Board, the U.S. District Court and the U.S. Court of Appeals for the

First Circuit and Federal Circuit where he litigated his case against the agency and he lost. How

can this or any court for that matter, reconcile this clearly mutually exclusive actions? Although

we are the least ones indicated to plead for him, if AIC Nater was right he should have been

commended as he claimed instead of summarily expelled with a dishonorable discharge. On the

other hand, if this system of "Justice" has proven him wrong ad nauseam, how could his flawed

and "unsupportable" findings be legally upheld? How can anyone reconcile this?

    5. We produced as hard evidence in addition to all of the above, over 12,000 student

ledgers that serve as the primary source in support of the audited financial statements by

independent C.P.A. firms with totally unqualified or clean opinions that controvert this genuine

issue of material fact in controversy, pardoning the redundancy.

    For the Defendant part, the USDE in terms of this issue only counted with viciously

inflated findings, imputed by an expelled auditor denounced in writing by their own Quality

Assurance Review as flawed, lacking in logic and unsupported. Then, may we respectfully ask,

how can you explain the final result of the decisional scales here given this dramatic contrast?

the specific names, with specific social security numbers, with amounts refunds, the dates, the specific batch numbers where each one was reprocessed to have the refund paid. This har evidence is so overwhelming and robust that in professional complain proceedings that we have filed against the USDE lawyers for their abuse of the legal process, malicious prosecution, subornation of perjury, perjury and violation of our constitutional, and civil rights, we have reached the extreme of stating that the only piece of evidence that we have not produced to prove this point are the **"prepuces and hymens"** of the students themselves, which we feel a little unreasonable for someone to pretend that we produce. Everything else probable and possible is in your docket.

On the other side of the coin, what did the USDE counterproduced as evidence in this vein? The excerpts of a perjured testimony of AIC Lugo, which are absolutely controverted by the own USDE official documents used in support. To add insult to injury we produced evidence that this AIC also was forced to leave the USDE after his flaws in our audit and has had the audacity of working for the institution which the Plaintiffs' used to be the main competitor, Instituto de Banca, even representing to the USDE that he was its President when its true President was indicted by this U.S. Attorney for part of the Victor Fajardo scheme of corruption at the Department of Education of P.R.

For the above reasons alone, this Court should be persuaded that this issue should be not only reconsidered but ruled summarily in favor of the Plaintiffs in view of the quantity and quality of our evidence vis a vis theirs which is incredible and controverted by their own official documents. With this only, this Court would place itself in a position to order the immediate

18

payment of the funds preconfiscated by the USDE in regards to this claim, as requested supra, and that and only that should be enough for me to hire counsel for both IEU and myself and for Justice to be finally served to the more than 5000 students, 500 employees and hundreds of honest and hard working people whose lives were devastated by these officers heinous and egregious actions for uncontrolled selfish personal agendas.

If this Court shall decide otherwise, it will reconfirming our denunciations made elsewhere that a pervasive bias and prejudice has permeated all proceedings of the Plaintiffs' within this system of courts all throughout the almost ten (10) years we have been beseeching for Justice, and if not Justice and day at least a day in court and a fair trial. I only hope that by now, you may become persuaded that I am not in a position to renounce to my rights or to relinquish my struggle for vindication. Our truth, conviction and will is much stronger than the bias, prejudice, and abuse of power under the color of authority combined we have been abused of. I just pray that you spare this system of courts delaying more the inevitable and that is that the real truth will eventually emerge whether you want it or not and that the racist bigots and truants that performed this atrocity will not continue to remain impugned thanks in part to the U.S. Attorney's Office lawyers limiting themselves to play second fiddle to their counterparts at the agency-client instead of taking half a day to sift the evidence as they are supposed to do and come to realize that they have spent all their time and effort in vein, defending what eventually will not be able to be defended simply because it was deliberately and wantonly concocted, fabricated, inflated and fraudulently presented and represented to the courts.[6]

---

[6] Simply because we trust that this Court will alter its judgment in some if not all the claims or issues, we expect the fines to be proportionately adjusted.

So I state, allege and pray. Respectfully submitted, today March 24, 2005.[7]

Angel Ruiz Rivera

Pro Se [8]

P.O. Box 191209, San Juan, P.R. 00919-1209.

787-714-1069


**Certificate of Service**

I, Angel Ruiz Rivera, appearing for the Plaintiffs', Pro Se and IFP, hereby certify that a copy of this petition was served through mail to the appearing counsel for the Defendant, Isabel Munoz Acosta, Esq., U.S. Attorney's Office for the District of Puerto Rico, Civil Division, Plaza Chardon Suite 1201, 350 Chardon Ave. Hato Rey, P.R. 00918 and to Gregory Usera, IEU's attorney at Schuster Usera & Aguilo, P;.O. Box 363128, San Juan, P.R.00936-3128.

---

[7] Again, I pray that you accept the resignation of attorney Usera and relieve him from the uneasy predicament he has remained for the past months.

20