## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Instituto de Educacion Universal, Et Al.

v.                                                    98-2225 (RLA)

U.S. Department Of Education,
Richard Riley, Secretary

---

## MOTION FOR RELIEF OF JUDGMENT

To the Honorable Court (HC):

Comes now the Co-Plaintiff, Angel Ruiz Rivera (ARR), appearing here Pro Se, and

respectfully states, alleges and prays as follows:

This Motion is being respectfully filed pursuant to Federal Rule of Civil Procedure

(FRCP) 60 (b) (3): On Motion ..., the court may relieve a party...from a final judgment, ...for the

following reasons: ...."fraud ..., misrepresentation, or other misconduct of an adverse party". The

following applicable and controlling jurisprudence is cited in support. See Hazel Atlas Glass Co.

v. Hartford Empire Co. 322 U.S. 238 (1944); United States v. Gould, 301 F.2d 353, (5$^{th.Cir}$ 1962);

Rozier v. Ford Motor Co., 573 F.2d 1332 (5$^{th.Cir}$. 6/5/1978); Ervin v. Wilkinson, 701 F. 2d 59

(7$^{th.Cir}$.1/13/1983); United States v. National Medical Enterprises, 792 F.2d 906 (9$^{th.Cir}$.

6/23/1986); Green v. Foley 856 F 2d 660 (4$^{th.Cir}$. 9/13/1988); Alexander v. Robertson, 882 F. 2d

421 (9$^{th.Cir}$. 3/16/1989); Aoude v. Mobil Corp., 802 F.2d 1115 ( 1$^{st.Cir}$. 12/29/1989); Shepherd v.

American Broadcasting Co., 94-7141, (D.C. Cir. 8/25/1995); Pearson v. First NH Mortgage

Corporation, 200 F. 3d 30 (1$^{st.Cir}$.12/29/1999); Dixon v. Commissioner of I.R.S., No. 00-70858

(9$^{th.Cir}$.1/17/2003); and Hull v. Municipality of San Juan, 356 F.3d 98 (1$^{st.Cir}$. 1/20/2004).

1

**Introduction**

The instant case represents what will most probably become a text-book administrative law case on **how not** to administer "Justice". It all started when various of the intervening federal officers, *ab initio*, concocted a flagrant malicious prosecution against the Plaintiffs, without provocation of any sort, assuming a provocation could have justified in any conceivably way or manner such an ignominy. The overwhelming, tclear and convincing, beyond doubt and even "smoking gun" evidence included, prove that these officers malevolent actions were motivated by their own personal agendas, biases, prejudices and invidious discrimination against the Plaintiffs. Simply because of the ethnicity and national origin of the latter plus the deeply embedded misconception of the former which makes them believe in the fallacy, that the only *raison d'etre* of Puerto Rican institutions and persons such as the Plaintiffs' is to bilk the federal fisc. [1]

As the HC will be able to corroborate *ad nauseam*, in order to accomplish their mischievous ends, these federal officers, especially the lawyers intervening throughout the processes, have consistently abused the legal process as their main means or strategy. This abuse has been perpetrated with an arsenal of tactics that have included but not been limited to: fabricating and manipulating evidence, suborning perjury, committing perjury, intimidating witnesses and obstructing justice, in ways and manners unbeknownst to the intervening courts which have heretofore perhaps inadvertently, allowed them to get away with this monstrosity.

---

[1] The myriad of criminal cases in recent years for corruption in the administration of federal funds filed by the U.S. Attorney, most of them against members of the Pro-Statehood, New Progressive Party (NPP), which even led the ex-Acting U.S. Attorney Gil to publicly pronounce that corruption in Puerto Rico beared that name, have definitely not contributed an iota to alleviate or countervail this overgeneralized bias among some federal officers.

For all the above reasons, this Motion is more than justified. It is a must.

In the process, these federal officers, its lawyers included, have also unremittingly committed fraud upon all the courts that have been supposed to be evaluating the legal claims or issues at stake in this controversy all throughout these proceedings. Starting with those at the administrative level, including those before their own agency's Administrative Law Judges (ALJ's) and eventually before the own U.S. Department of Education (USDE) Secretary. Continuing at the Honorable District Court for the District of P.R. (HDCDPR) level. Ending, so far, at the Honorable U.S. Court of Appeals for the First Circuit (HUSCA1C) level and at the Honorable U.S. Court of Appeals for the District of Columbia. (HUSCADC). See appeals 04-1397 and 04-5431 at that Honorable Circuit.

In what follows, this HC or whichever ends evaluating this Motion,[2] will be able to corroborate, how itself also fell as an additional victim of all the ill-actions denounced herewith. The HC will verify that regardless of whether the denounced sham was orchestrated in a form of a conspiration or not, it was nevertheless induced into error by the wanton, heinous, and egregious actions of these denounced officers. Upon the proper and careful evaluation of this Motion, the HC will undoubtedly be able verify and validate that it also has been haphazardly fooled by them all throughout this process, just as the Plaintiffs were. Have no doubt about it.

Heretofore, these federal officers have been able with chicanery to persuade the evaluators of the instant and related cases of the alleged merits of their clients. In the process, they have been able to get away with their mendacity, giving the impression that they have done nothing wrong, and that they deserve to prevail, in spite of the what the real facts, the law and the

---

[2] Depending upon the decision on motions for transfer that will follow.

Truth are.

All this, without having to: provide even for a bare-raw modicum of discovery; confront witnesses in hearings; much less undergo a full-fledged trial. These clearly undeserved exemptions granted to them have provoked that their abuse of the legal process, malicious prosecution, suborn perjury, perjury, manipulation and spoliation of evidence, obstruction of justice, intimidation of witnesses, and fraud upon the courts, to this date persist with total and absolute impunity. Since this is untenable and unbearable, not only for us but to anyone similarly situated, we are morally, ethically and legally obliged to file this Motion, just to set the record straight and to make certain that "Justice" may eventually be properly served, as it always should.

An HC  which acts impartially and without bias or prejudice over these matters, will be able to corroborate that in order for the denounced officers to be able to accomplish this otherwise formidable task of persuading the courts,  (or fooling them), of what ironically they should not have been able to persuade, (or fool), them under normal circumstances, [3] the lawyers that firstly represented the USDE officers, who were the architects of this farce, (those from the agency itself), and those who have secondly represented them, [those at the U.S Attorney's Office-(USAO)], who consequently acted as the engineers of the former, not only have been derelict in their duties by not sifting all the overwhelming, more than clear and convincing, but even sometimes beyond doubt, including "smoking gun" evidence, that totally exonerate the Plaintiffs, but have reduced their vital screening role to act as mere rubber stamps, sounding boards or dummies of those who originated the malicious prosecution. Ergo, they have sentiently

---

[3] Due to what I have denominated the strong "presumption of righteousness" given to all government lawyers, by most people, Honorable Federal Judges, not excluded.

or not, condoned and/or acquiesced to the former Machiavellian acts.

This obligatorily implies that they have failed to comply with their ministerial and ethical duties for meager personal agendas and the "spoils of office", just as the originators of this entire hoax did.[4] Worse, in so doing, they have either banded or confederated together with their predecessors, or, by the consequence of their actions, have condoned and/or acquiesced to their colleagues criminal and unethical actions that assassinated the Plaintiffs, not only in terms of character, but economically, psychologically, emotionally and in all other imaginable and unimaginable senses. [5] Among those assassinated in the above ways and manners we have:

1) a community of tens of thousands of people positively affected by an institution educating and training 5,000 disadvantaged students on ironically how to become less dependent on the U.S. of A. fisc; (Co-Plaintiff- Instituto de Educacion Universal - IEU);

2) more than 500 honest and hard working educators and their supporting cast of administrative and non-administrative personnel that for more than sixteen (16) years had devoted themselves to this mission, and;

3) hundreds of honest and hard working persons and entities that contributed to this feat

4) all of its main officials, foremost and most saliently, its President, CEO, fiduciary

---

[4] **"Men such as they are, very naturally seek money or power; and power because it is good as money,- the "spoils", so called, "of office". An why not? "** Quote from a speech given at an annual meeting of the Phi Beta Kappa chapter at Harvard, August 31, 1837, entitled "The American Scholar", by Ralph Waldo Emerson.

[5] As I have stated elsewhere, INJUSTICE is something that the human being (physically) has not even through evolution found a way to metabolize and it is certainly not psycho-emotion-spirit degradable (as in biodegradable). The only cure or remedy for INJUSTICE is the finding of at least some modicum of JUSTICE, even if it comes about late. This, although we all know that: "late justice is not justice."

agent, person "responsible" for its taxes, and promoter of this action (Angel Ruiz Rivera-ARR).

All of the above were working together to provide quality education and training to thousands of disadvantaged Puerto Ricans and other poor minorities in Puerto Rico, such as immigrants from the Dominican Republic, Cuba, and other Caribbean Islands, by adequately preparing them to either enter the labor force or escalate in their economic ladder. In that form, the Plaintiffs were reducing or eradicating their economic dependency on the U.S. of A. and/or the Puerto Rican fisc. Most ironically, these students, just as the Plaintiffs', have been unjustly accused by some of the same federal officers that originated the malicious prosecution denounced here and elsewhere, as people whose alleged main alleged interest is just to bilk that same U.S. of A. fisc.[6]

_____

[6] Since P.R. ranks fourth from the highest to the lowest, among all States, territories and possessions (the latter are euphemisms for colonies), as recipient of federal funds under Title IV of the Higher Education Act (HEA), namely, the Student Financial Aid Programs (SFAP's), and since most inhabitants of Puerto Rico do not pay federal taxes, this is equated by many federal officers, starting with the ones responsible for the evil actions in the instant and related cases, as unfair, to say the least, to the rest of the "mainland" taxpayers (perhaps understandably). Of course, no one has educated them as to the fact that for more than one hundred and seven (107) years, the government of the U.S. of A. has treated Puerto Rico as an ordinary colony first (since the military invasion of 1898) and as a relatively sophisticated colony second, (since the "home-rule" provisions of the so-called Free Associated State of 1952, and accordingly, treated Puerto Ricans as ordinary or relatively sophisticated colonial servants, but in any event, third rate "citizens", or worse, children of a lesser God. These officers do not know, ergo, are not in a position to recognize that the Great U.S. of A., has been occupying all of this archipelago, questionably to say the least, all of its land and the properties where it imposed itself by military force, including but not limited to, those where it has operated all of its military bases and federal agencies, as its illegal and immoral usufructuary for as many years. They also ignore that throughout all these more than five score and seven years, many hundreds of billions of dollars have been expatriated by U.S. of A. corporations from P.R. to the "mainland", mainly due to the Puerto Ricans productivity amidst those entities' stockholders investments, without paying taxes to P.R., due to tax benefits that the latter have made certain that remain available for them to use and abuse both at the U.S. Congress and the Puerto Rican legislature. All of these benefits have the otherwise Great U.S. of A. obtained from P. R. and the Puerto Ricans, without having paid, nor recognized, much less credited a penny to us, for this immoral if not illegal occupation that haunts us both to this date. This is without counting that Puerto Ricans, since 1917, when unilaterally imposed U.S. citizenship, have always ranked first or among the first in deaths per ethnic group, per capita, as a result of their service in the military. Since the federal officers denounced herewith are ignorant of the facts and history, all they see is one side of the coin: theirs. For

**The Agents of the Fraud**

The first string of federal officers who committed fraud upon the courts were the own Auditors- In-Charge (AIC) of the U.S. Department of Education (USDE) audits of the Plaintiffs, who issued the flawed "findings", manipulated data, and committed perjurious testimonies to support the fraudulent claims against the Plaintiffs which originated the issues in the instant case that still have us here litigating. These were; namely: Rafael Nater, a Certified Public Accountant (C.P.A.) and lawyer, who was the AIC for the USDE's Office of the Inspector General (OIG); and Felix Lugo, an experienced auditor, who acted as the Program Review auditor of the USDE's Institutional Review Branch (IRB), the internal auditing branch of the USDE.

They committed fraud upon the courts by first, imputing "findings" *ab initio*, that they knew perfectly well were patently false. Second, the fraud was exacerbated when they maintained, retained and sustained the "findings", aided and abetted by the USDE lawyers, (Ms. Gil Montero and Mr. Wolff and their superiors), amidst the Plaintiffs showing of even beyond doubt evidence, that clearly rebutted all of them in their entirety. Thirdly, the fraud became blatant in the case of Lugo, when he submitted to a subornation of perjury by the USDE-OGC lawyers (see evidence, infra) and lend to perjure himself to falsely declare against the Plaintiffs, just as he did against another institution which he also viciously destroyed contemporaneously with his *ultra vires* acts. See San Juan City College (SJCC) and Americo Reyes[7] v. U.S., 03-

---

them, all we strive for is to bilk the U. S. of A. fisc.

[7] Notice in that case, that the SJCC's President status as Co-Plaintiff has been honored. Incidentally, the HC, described the actions originated by Lugo as "Given the Kaka-esque nature of the bureaucratic bungling reflected on the record..." SJCC, v. The U.S., No.01-73C, 8/8/2003, in the U.S. Court of Federal Claims, p.8 of 11.

5180, U.S. Court of Appeals for the Federal Circuit, (12/9/2004).

All this, only to later quit the USDE, to join their (both IEU's and SJCC's) main competitor: Instituto de Banca y Comercio-IBC and to even act as its President when its real one, Fidel Alonso Vals, was indicted by the U.S. Attorney [8] with criminal charges in one of the sequels of the ex- Secretary of the Department of Education of P.R., Victor Fajardo's cases for corruption in the management of federal funds.[9] Paradoxically enough, when this indictment transpired, the USDE officers denounced here, did not take any action against IBC, as mandated by its regulations, whenever the President and/or Chief Executive Officer (CEO) of an institution falls under such a predicament. There was no pre-confiscation of funds to be disbursed, no switch to the reimbursement method of payment, no request for a surety or guarantee in the form of a letter of credit to be produced or issued in sixty (60) days or whatever, and much less a initiation of termination of eligibility action just as the federal officers complained about and denounced herewith, did with the Plaintiffs, even when they were never indicted. A penny for your thoughts.

The second string of federal officers who committed fraud upon the courts were the supervisors of the formerly mentioned USDE lawyers; namely: Ms. Ellen Bass, Esq., the OIG Chief Legal Counsel and Ms. Jammienne Studley, Esq., the USDE's Office of the General

---

[8] Nater was simply not available to be suborned to perjure himself because he was expelled from the OIG before the USDE lawyers could even attempt this as they did with Lugo. See AIC Nater's related cases against his former employer, the USDE, all of which were denied. At the Honorable U.S. Merit System Protection Board (HUSMSPB), NY-1221-96-0334-W-1 and NY-1221-98-0401-W-1. At the U.S. Court of Appeals for the Federal Circuit (HUSCAFC), [(99-3083), (99-3143), (99-3213)], all denied and affirmed in 232 F.3d 916 (Fed. Cir.5/9/2000). At the Honorable U.S. District Court for the District of P.R.(USDCDPR), 99-1366 (JP), denied and affirmed at the Honorable U.S. Court of Appeals for the First Circuit, 00-2348 (1st.cir. 7/23/2001).

[9] See the indictment of Fidel Alonso Vals, the President -Founder of IBC, in criminal case 3:02-cr-00042-HL.

Counsel (OGC) Chief Counsel.

      The third string of federal officers who committed fraud upon the courts are the U.S.

Attorney's Office (USAO) lawyers, who also failed to comply with their ministerial duty, by not

sifting the fraudulent evidence submitted by the client-agency lawyers having banded together

with the above, and  sentiently or not, condoned and/or acquiesced to the fraud upon the courts

concocted by the former and which they consummated. Among the lawyers that lend themselves

to serve as mere rubber stamps, sounding boards or dummies of the above, we have: the

Assistant U.S. Attorney (AUSA), Isabel Munoz Acosta, Esq.; her supervisor, the ex-Acting U.S.

Attorney General, Guillermo Gil, Esq., and his subsequent successor, Mr. Humberto Garcia, Esq.

**The Arguments and the Evidence of the Denounced Fraud**

      In the instant case, [10] which is supposed to be the judicial review of the final agency

action of all the flagrant abominations denounced before, the fraud upon the courts have been

---

[10] We filed a previous case on July 23, 1996, Complaint, 96-1893(JAF), against the USDE and some of the officers that initiated the heinous and egregious *ultra vires* actions to destroy IEU and ARR. That action was prompted due to the fact that these officers illegally: 1) maliciously manipulated IEU audited financial statements issued by independent C.P.A firm KPMG, in a non-profit corporation "fund accounting" format that the Generally Accepted Accounting Principles (GAAP)'s and the Government Auditing Standards (GAS)'s prescribed at the time and treated them as if they were issued in a profit corporation "standard" format, only to achieve the pre-conceived result of claiming that IEU allegedly did not meet an "acid test ratio", which was also *ultra vires* since the Higher Education Act (HEA) provisions at the time clearly provided for a less stringent "current assets to liabilities ratio"; 2) denied to extend IEU's eligibility to a new campus in Caguas, P.R. and; 3) demanded an 8.75 million dollar letter of credit, to be produced in 60 days, in order for the institution's eligibility to be maintained . In addition, these officers denied IEU, the special exemptions that the HEA, specifically provided for non-profit institutions just as IEU's , including the statutorily allowed payment and performance bond in lieu of the letter of credit. In order to achieve their preconceived agenda, they switched IEU to the reimbursement method of payment, unilaterally and in breach of the contract (the Program Participation Agreement-PPA) between the USDE and IEU, signed by ARR, as its President and fiduciary agent. The above case was railroaded twice and consequently all the above illegal actions by the USDE officers were protected and immunized by the HC, without a hearing or a single day in court, much less a full fledge trial. This prompted the filing by ARR of various complaints for judicial misconduct before the Judicial Council of the HUSCA1C, to which they turned a deaf ear. See related case 00-1609 (DRD) and appeal 01-1611.

repeatedly manifested in the following ways and manners.

First, to put these serious accusations in their proper perspective, the claims by the Plaintiffs in the instant case narrow down to their statutorily protected right [11] to request judicial review of the three audit "findings" viciously imputed by the AIC's, for the supposed mal-administration of the funds that the Plaintiffs had a fiduciary and contractual obligation to honor. Most of them have heretofore been inexplicably upheld by all the intervening courts due to the evident fraud denounced. These "findings" are: the so-called "clock hour"; the "excess cash" and the "unpaid refund" findings. The first two were the product of OIG's fabricated and grossly inflated audit by OIG-AIC Nater and the latter one the product of the perjury of IRB-AIC Lugo.

We need to call the attention of the HC as to the *fait accompli* that after their respective audits in question against the Plaintiffs were done and over, Nater was expelled from the OIG and Lugo resigned from the IRB. (Lugo to join the Plaintiffs' main competitor as mentioned above). We respectfully aver that this mere fact should at least raise some eyebrows, in case that it does not persuade the objective evaluator of this controversy, that there was and is something very fishy in the instant case, to say the least. We invite the HC to meditate upon the fact that if these AIC's, would have complied with their ministerial duties as the lawyers denounced above have heretofore maintained, retained and sustained, why was Nater expelled and Lugo resigned *ex-post-facto* from the USDE? Why was Nater not commended by the USDE as a result of his good job, as he claimed in his cases, since the USDE pre-confiscated from the Plaintiffs more than $2.263 million dollars based on his work product (albeit unconstitutionally)? Why did Lugo

---

[11] See the Administrative Procedures Act, 5 U.S.C. sections 701-706. For the principle of reviewability, see also, Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967) and Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, (1971)

quit the USDE and joined the Plaintiffs' main competitor (IBC)? A penny for your thoughts.

As our second argument regarding this issue, we must refer this HC to the nefarious, absurd and bordering on the stupid if not stupid altogether; clock hour "finding", by Nater. The hard evidence emanating from the own OIG Audit Draft Report and Audit Report, demonstrates beyond any doubt, that the Plaintiffs did not charge for non-instructional time, which is precisely the gist of the issue here. See Draft Report of July 1995 at p.4.[12] See Audit Report of September 1995 at p.5-6.[13] Both these reports equally spelled out that for its day and evening sessions, IEU:

" (1) Includes a 50 minute recess that IEU **did not consider as instructional time**."
" (2) Includes a 20 minute recess that IEU **did not consider as instructional time**."

If these reports spelled out that the Plaintiffs did not charge their recesses as instructional time, "Where is the beef?", like the Wendy's Restaurant advertisement stated. In a less allegorical expression, where was the mal-administration, or worse, the alleged overcharging of hours not attended, as the intervening lawyers have pretended the courts to sustain?

The above citations are more than pertinent and relevant because they should serve any unbiased and impartial evaluator to be persuaded of the *fait accompli* that, the claims made here from the outset, were fraudulent, frivolous, and done with effrontery, ergo, the malicious prosecution. The mere arithmetical corroboration of the **net minutes of instruction** in the school day *vis a vis* the **gross minutes in the school day** (or night for that matter), necessarily entails that mathematically, ergo, scientifically, the Plaintiffs not only **did not** overcharge but it implies

---

[12] Exhibit 4 of the Complaint at the U.S. Department of Justice, Office of Professional Responsibility, (CUSDJOPR) against the U.S. Attorney's Office lawyers included here as Exhibit 3. See page 45 and its accompanying pages.

[13] Exhibit 5 of the CUSDJOPR, cited supra. See page 46 and its accompanying pages.

that the way the were managing their schedule, there was simply **no** way they could had.

This is the saddest irony of the instant case with respect to this issue which is not much different from the others that we will discuss further on, as this HC shall be able to verify. Ergo, in this vein, just as in all others, the conduct of the Defendants' lawyers throughout this process has been temerarious and contumacious besides plainly vicious. All the Defendants' lawyers have clearly obstructed justice in this vein since the outset, since they wantonly and fraudulently occluded the courts from the above truth emanating from the own audit reports that exonerate the Plaintiffs in all senses regarding this issue, mathematically speaking.

We respectfully refer the HC to our Statement of Contested Facts timely filed in the instant case, from where we import the following pertinent and relevant quote:

> 10 c. This "uncontested" fact also fails to admit and recognize that regarding this issue, its Chief Auditor Rios, under oath declared that IEU was not overcharging the USDE. This is the exchange that took place.
>
> In the October 22, 1996, administrative hearing, at p. 178, the USDE's witness, Mr. Porfirio Rios, declared: (OIG Chief Auditor who was brought to testify in lieu of his inferior AIC Nater since the latter had been expelled, although the USDE lawyers also occluded this fact from the court) [14]
> Question by Mr. Cerezo: But you can guarantee that after auditing their representation of 50- minute classes is being confirmed, that that's the same thing that they are offering in their brochures, correct? **That they were not overcharging, they were not overcharging 60 minutes for 50 minutes.**
> **Answer by Mr. Rios: No, they're not charging 60 minutes.**
> **Q. That would be your testimony under oath.**

---

[14] The testimony by OIG Chief Auditor's (Rios's), should not had been allowed since it is entirely pure hearsay, (see Federal Rules of Evidence 802, et seq.) since because Rios was not the AIC of the Plaintiffs' audit. The USDE lawyers misrepresented to the ALJ that Rios allegedly had personal knowledge of the audit performed by AIC Nater due to the former being the *de jure* supervisor of the latter. The truth of the matter, however, is that they produced Rios simply because Nater was not available since they had expelled him in part for his flaws in the Plaintiffs audit and in part for his history of insubordinations against Rios, whose supervision Nater never accepted. The USDE lawyers occluded this genuine issue of material fact from all the courts just as they did with all the others denounced.

**A. That's my testimony under oath.**

Furthermore, in the USDE-OIG  June 28, 1996 Final Audit Determination (FAD) at p.3 of 8,[15] it

acknowledged and conceded that:

> During the period prior to the change in the definition of a clock hour (prior to the 1993-94 award year) **there may have been ambiguity in the interpretation of the regulation regarding the definition of clock hour. Therefore, we are not assessing a liability for the years prior to the 1993-94 award year.**"

This concession on the FAD represented a late admission that the imputation of this finding *ab*

*initio*, was vicious. As vicious it was for the years prior to the1993-94 year, as it has remained for

the later, except for the USDE lawyers whimsical pretense not go concede the inevitable which is

what they are going to have to concede eventually, whether they want it or not.[16]

In view of the above and left without any other alternative, all the government lawyers

have almost graciously conceded to all the intervening courts in all their writings that the "clock

hour regulation may have been ambiguous" prior to the amendments to the Federal Register of

July 1993 and the purported clarification of the Secretary in its Preamble, (also rejected by their

own ALJ in the case In The Matter of MBTI, see infra). But once having admitted to this, none of

them have explained to the courts, in what we claim is overt fraud, why the USDE originally

imputed this "finding" viciously for the years 1991-1992, 1992-1993, deliberately inflating the

---

[15] Exhibit 6 of the CUSDJOPR, cited supra. See page 47 and its accompanying pages.

[16] Eventually, the own OIG reduced this amount in its FAD to 1.2 million by eliminating the 1991-93 years. It is our contention that they should had eliminated it entirely and that is the genuine issue of material fact in controversy that still have us attached here regarding this issue. The elimination for two of the three years on the self-conceded account that it was ambiguous constitutes by and in itself a capricious, arbitrary and not in accordance with the law decision.

resulting liability and so informing it to the U.S. Congress. [17]

This is a flagrant fraud to the courts inasmuch all the legal opinions, audit memorandums and the *stare decisis* at their own agency by their own ALJ's explicitly and specifically rejected this absurd and bordering on the stupid whim. See evidence infra. None have explained why, even when they backpedaled in terms of this issue, they committed libel against the Plaintiffs before the U.S. Congress, when they jumped to conclusions without allowing for the minimum due process guarantees and before the "finding" was "final"even at the own USDE. By reporting that the Plaintiffs had been "caught stealing" as a result of this fabrication, they gave the impression that they were supposedly doing their job well. To this date the USDE officers have not corrected that improvident and libelous information.

At this juncture, we must raise the *fait accompli* that this issue had been treated before *ad nauseam* at the USDE since 1985,[18] and in all instances, all authorities, had invariably, consistently decided it against the absurd, senseless and bordering on the stupid, if not stupid altogether whim of whomever at the own USDE was *ultra vires* pushing this issue beyond the limits of what is reasonable and logic, much less legal.

Please review the overwhelming, more than clear and convincing, and even beyond doubt

---

[17] To add insult to injury, the USDE officers denounced herewith, in their September 1995 Semi-Annual Report To Congress, even before their OIG FAD was issued, much less final and even less firm, informed that they had "caught" the Plaintiffs, "stealing" over 3 million dollars from the fisc, as a result of this "finding", only to later admit and concede to the courts that the regulation they allegedly based it upon "may have been ambiguous" for the first two of the three years in question and consequently eliminating the liability for those years.

[18] The "authority" used by the OIG in support of its posit regarding this issue was ill-based on the interpretation of an answer to a Questions and Answer (Q&A) section of a clearly non-binding "Dear Colleague Letter" that the USDE's Student Financial Aid Programs (SFAP's) section produced on June 1985.

evidence in this vein produced by the Plaintiffs, since the outset of the administrative procedures,

totally occluded from the courts, by all the Defendants' lawyers, throughout these proceedings. a

**In terms of the "Clock Hour Finding Issue"**

1. The USDE-OGC legal opinion by Mr. Fred Marinucci, Esq., entitled "Note to Clifton

Knight, IRB: Re: Measurement of non-standard class sessions in clock hours". [19] This seven (7)

pages long legal opinion by the USDE- IRB's Chief Auditor in, D.C., ended by stressing that:

> " To uphold the interpretation of the regulation advanced in the Dear Colleague and the Q
> & A, the regulation must be ambiguous enough to leave room for interpretation, and the
> interpretation must be consistent with the terms of the regulation and the reasons the rule
> was adopted. **Because the regulatory language "equivalent of a 50 to 60 minute
> period" is not ambiguous on its face, and because the rule was promulgated with the
> avowed intention to preserve institutional flexibility, it seems more probable that a
> reviewing administrative tribunal or court would reject the Dear Colleague
> restriction applied** to the 100-minute class considered by the program reviewer here".

The government lawyers wantonly occluded this to all the intervening courts in overt fraud.

2. The IRB's Chief Auditor, echoing the above legal opinion by the OGC, issued a Memorandum

of the Division of Audit and Program Review, admonishing the auditors for the treatment they

had been theretofore giving to the issue, establishing the following policy:

> Purpose: To clarify the definition of a clock hour in Section 668.1 of the General
> Provisions regulations and provide guidance to reviewers in determining a school's clock
> hour compliance.
> "...The regulatory definition, as defined in the law, states that a clock hour is the
> equivalent of a 50 to 60 minute class, lecture or recitation. **The law does not stipulate
> that a break of any given length must be given in a 60-minute period.**(bold ours)
> **Because the Department's concept of a clock hour included provisions not specified
> in the regulatory definition, we requested an opinion from the Office of the General
> Counsel (OGC).** We asked OGC to determine whether or not the Department's
> interpretation of a clock hour would withstand a legal challenge.

---

[19] Exhibit 7 of the CUSDJOPR, cited supra. Page 48 and its accompanying pages. See also page
28 et seq. of the Complaint for Violation of the Rules of Professional Conduct (CVRPC) against the
USDE lawyers filed at the Office of the D.C. Bar Counsel, included here as Exhibit 1.

OGC's Response

**OGC's response concludes that the regulatory definition of a clock hour "equivalent of a 50 to 60 minute period" is clear and does not require the Department's interpretation. Furthermore, the regulation was written with the intention of preserving institutional flexibility. Therefore, it would seem more probable that a court would reject the Department's interpretation.**

DAPR Policy:

IRB's guidance for required action for program review findings of this nature is as follows:

Example 1: When a program reveals that an institution taught two 50-minute classes in succession without a break, e.g. 8:00- 8:50 and 8:50 - 9:40, (Just as in IEU's case, our parenthesis) **the reviewer should not cite a finding or take any action....**"

(See Exhibit 8 of the CUSDJOPR, cited supra. Page 49 et seq.).

The government lawyers wantonly occluded this to all the intervening courts in overt fraud.

3. There is a third reason why the federal lawyers here, starting with Ms. Gil-Montero and Mr.Wolff and continuing with their superiors, Ms. Bass and Ms. Studley, knew very well that the clock hour finding against IEU was frivolous indeed and that was their knowledge of the ALJ decision in the case In The Matter Of Denver Paralegal Institute, 92-86-SP and 92-87-SA. That decision was issued on March 14, 1994 and affirmed by the Secretary on February 24, 1995.

In other words, **it was issued two and a half months before IEU's OIG audit commenced and it was reaffirmed four months before the IEU's OIG audit Draft Report was issued** (July 1995). The government lawyers wantonly occluded this to all the intervening courts in overt fraud.

On page 16, of said decision the ALJ stated:

**" Initially, a clock hour is defined by 34 C.F.R. section 668.12 (1989) as "the equivalent of a 50 to 60 minute class, lecture, or recitation." Thus, 50 minutes of instruction is sufficient to constitute one clock hour. Hence, the regulation is clear that clock hour measurement does not correspond precisely with the actual amount of time of instruction. Clock hour measurement will always be the same or more than the actual instruction time. Hence, ED's premise underlying its litigating position– that clock hour measurement reflects actual time– is inconsistent with the**

16

**Department's regulation.**
To reach its premise, ED argues, in effect, that a period for a break must also be included as part of a clock hour of instruction. Under ED's view, the sum of the break period and the instruction period must equal an actual hour of time in order to constitute a clock hour. Therefore, it asserts that DPI's 150 minutes of evening instruction is less than three clock hours because DPI's evening session failed to include three 10 minute breaks.
ED' position is based on the 1992-93 Student Financial Aid Handbook which contains a provision not included in earlier editions–
It is not allowable to count more than one clock hour per 60- minute period; in other words, a school cannot schedule several hours of instruction without breaks, and then count clock hours in 50-minute increments. The result would be that seven hours of consecutive instruction would count as 8.4 clock hours (420 minutes/50 minutes=8.4 hours). This is not allowable; seven real-time attendance hours cannot count for more than seven clock hours.
In this case, the ninth month evening program consisted of four lectures each week. Each lecture was held from 6:00 P.M. to 8:30 P.M. and provided 150 minutes of instruction. This approach provided the same quantity of education as would have been provided by three separate, 50 minute classes with three 10-minute breaks.
The clock hour regulation focuses solely on the period of instruction. Break periods are not relevant under the regulation. **Thus, the determining factor is the quantity of the education provided, not whether there is or is not a break provided before or after the period of instruction.** In this case, the minimum quantity of education provided at DPI satisfies the quantity required by ED's regulations..." (See Exhibit 8 of the CUSDJOPR, page 50, et seq.. See also pages 29 at the CVRPC, cited supra).

As any objective and impartial evaluator of this evidence can corroborate, the USDE had lost its frivolous raising of this issue for the nth time and did not pass its own ALJ muster before again viciously raised against the Plaintiffs. The fraud upon the courts lies in occluding this *stare decisis* which was applicable and controlling over the issue or shall we better say, non-issue.

4. The lawyers complained about here also knew very perfectly well about the decision of the USDE's own ALJ in the case In The Matter Of MBTI (93-147-SA). This one was decided on April 15, 1994, just five (5) weeks after the DPI case, and still a month and a half **before the start of IEU's OIG audit**. It was affirmed by the Secretary on July 9, 1995, merely four months after the DPI case and more than two months **before the OIG issued its IEU's Audit Report**

17

**and more than eleven months before OIG issued its Final Audit Determination (FAD).** In this case, the USDE lost again the raising of this issue.

Actually, this decision constitutes beyond doubt evidence that Ms. Gil-Montero, Mr. Wolff and their confederates and/or accomplices acted in blatant disregard of the law, the regulations, the legal opinions, the audit policy memos and their own ALJ's decisions affirmed by their own Secretary. The fraud again lies in occluding this *stare decisis* from the courts, which was clearly applicable and controlling over the issue or shall we repeat: non-issue. The lawyers wantonly occluded this to all the intervening courts in overt fraud. As this HC should verify, the instant case is one where the Defendants' lawyers have heretofore gotten away with foul play.

In MBTI's case, as probably guessed, the USDE re-litigated the same litany of rehashed frivolous arguments. The ALJ had no other choice but to accentuate it for the record.

> **"The positions and arguments of the parties in this litigation are identical to the dispute in In re Denver Paralegal Institute, (citations). There, ED's argument was rejected and the tribunal held that the clock hour regulation focuses solely on instructional time and that a clock hour may less than an actual hour of time–...... For the reasons ..., the position set forth in the Dear Colleague Letter is rejected"**

Nonetheless, the USDE had included an amendment to the Denver case argument and again unsuccessfully tried to persuade the tribunal. This is what the ALJ had to say regarding this "new" argument, **exactly the same one they fraudulently reiterated against IEU later on.**

> **"ED also relies on the Preamble to the Federal Register published on July 23, 1993.** In the Preamble, the Secretary notes that an institution may not compute clock hours by dividing by 50 minutes–(quote of the preamble)
> Regulations and decisions of the Secretary, issued in response to appeals of the decisions of Administrative Law Judges or hearing officials, are binding on this tribunal as accepted means of expressing policy and interpretation. **However, a comment by the Secretary in a Preamble is not a regulation and has no binding effect.** See Bissette v. Colonial Mortgage Corp. of D.C., 477 F.2D 1245,1247 (D.C. Cir. 1973); Gersman v. Group Health Ass'n., Inc., 725 F. Supp 573,577 (D.D.C. 1989); Council Of Hawaii

Hotels v. Agsalud, 594 F. Supp. 449,453 (D. Haw. 1984). "[T]he Preamble …is merely a general statement of policy which does not mitigate and certainly does not overrride the specific requirements laid out in the body of the statute." Samuels v. District Of Columbia, 650 F. Supp. 482, 484 (D.D.C. 1986)."

All of the above means in summary, that the USDE lawyers here had not one, nor two, or three strikes against the corrupt sustainment of this issue, but four strikes, all of them swinging the bat. First their own OGC legal opinion. Second their own Chief Auditor's Policy Memo. Third, their own ALJ decision in Denver, supra. Fourth, their own ALJ decision in MBTI, supra, where the same "new" arguments that they raised against IEU, regarding the amendment to the July 1993 regulations and the purported clarification in the Preamble, were both rejected by their own ALJ, and affirmed by their own Secretary. (See Exhibit 10 of the CUSDJOPR, page 51, et seq.. See also pages 31-32 at the CVRPC, cited supra).

Of the myriads of the evident frauds to the courts by the USDE lawyers hereby corroborated, egregiously echoed by the USAO attorneys, one of the most salient is that they have induced the HC into error by making the fraudulent representation in a reiterated fashion, that allegedly the MBTI case law *stare decisis* precedent by their own ALJ, should not be taken into consideration by the HC, simply because it supposedly addressed the issue before the July 1993 regulations came into effect. See SFAP's December 20,1996 Post Hearing Brief at p. 16, ¶3. "However, these cases interpret the definition of a clock hour before regulatory change..." (Underlined in the original). [20]

A careful reading of the evidence above is not necessary, a mere perfunctory reading should suffice for the HC, to necessarily conclude that this averment is blatantly fraudulent. As

---

[20] This fraudulent frivolity was reiterated by the USDE's lawyers in all their writings to the HC.

the above citation corroborates without any doubt again, the ALJ not only took into consideration

their heretofore always defeated temerarious and contumacious arguments in this vein, but it

went even further and defeated them again after having considered not only the amendments to

the regulations of July 1993, but even the purported "clarifications" of the Secretary to those

regulations in the Preamble of the corresponding Federal Register as published by the USDE.

This irrefutably constitutes the fifth strike against the USDE lawyers overt fraud in this issue.[21]

(" Since attorneys are offices of the court, their conduct, if dishonest, would constitute

fraud on the court."; Kupferman v. Consol. Research & Mfg. Corp., 459 F. 2d 1072,1079

(2d.Cir. 1972) ( an attorney might commit fraud upon the court by instituting an action "to which

he knew there was a complete defense"). Alexander v. Robertson, 882 F. 2d 421 (9[th.Cir.]

---

[21] See from NLRB v. International Union Of Operating Engineers, Local 925, 460 F 2D 589, 604 (5th. Cir. 1972), the following excerpt of perfect application to the instant case:

> **The law that Governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that is doing so and explaining why.** As Professor Davis has pointed out, **"The dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them."** 2 K. Davis, Administrative Law Treatise Sec. 8:9 At 198 (1979). **The agency has a duty to explain its departure from its prior norms.** The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required to effectuate Congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve educational policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggests that the rule not be applied in that case. **Whatever the ground for departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate . . .**
> If the agency distinguishes earlier cases, it must assert distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing. **Atchinson, Topeka & Santa Fe Railway Co. v. Wichita Board Of Trade, 412 U.S. 800, 808,809.**
> **... There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case . . . An inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated.**

3/16/1989), page 5 of 6, ¶ 30.

As an additional important note, this whimsical and vicious "clock hour finding", with all the previous strikes it had against it as we have corroborated up to now, even if honored by the HC for whatever reasons, clearly cannot be applicable to the Plaintiffs' case simply because by the time the USDE' amended regulations became effective, [forty five (45) days after July 23, 1993, that is, September 7, 1993], the fiscal or award, and academic years, were well under way (July 1). This obligatorily entails that the USDE's lawyers application of their own subjective interpretation, since-1985-always-rejected-by-all-of-its-own-authorities, should not apply to the Plaintiffs even under this supposition. Only if a court of law under these circumstances could find just, reasonable and logical that it should apply to them *nunc pro tunc*, this scenario could be possible however improbable it is indeed.

And then, it would amount to the inconceivable being unjustly made conceivable by fiat of a pervasive bias and prejudice, which we honestly doubt that any court could attempt to uphold, regardless of how biased and full of prejudice it may be for whatever reasons. This position would be clearly against all the most basic principles of administrative law. Even a non-lawyer like myself, have learned about the principle of non-retroactivity and its conventional wisdom. "Administrative interpretation which is out of harmony with the statute interpreted is inoperative, and where such interpretation is changed by a new regulation, it cannot be contended that the new regulation is retroactive when applied to transactions taking place before the change." Manhattan General v. Commissioner, 297 US 129. Also see Breyer, Stephen, G and Stewart, Richard, B. Administrative Law And Regulatory Policy, Little, Brown, and Co..1992.

For this reason alone, without more, without taking into consideration any other of the

21

many factors against it, this HC, should grant default or summary judgment for the Plaintiffs

regarding this issue, upon granting this more than justified Motion For A New Trial.


If more was needed, and we honestly doubt that there is, we still have pertinent and

relevant arguments to support our posit in this vein that should serve to easily persuade the HC,

that there is simply no way that the Defendants can eventually prevail regarding this issue, (just

as in all the others), due to their track record: the OGC legal opinion, the IRB Chief Auditor's

Policy Memo, the *stare decisis* of the case law by their own ALJs' and the overwhelming, more

than clear and convincing, and beyond doubt evidence against their whimsical posit. Ironically, it

is clear that regardless of what has transpired heretofore, there is simply no way that the

Defendants' may eventually prevail in the instant case, simply because they do not have the facts,

the law, nor the Truth on their behalf. It is a simple as that.

5. After the previous case and the instant case by the Plaintiffs against the Defendants

were initially and improvidently railroaded, the Plaintiffs learned through the grapevine that

Nater had been summarily expelled from the agency.

We also learned that Nater had sued the USDE at the USMSPB. We requested the record

of that case to the USDE lawyers and they simply replied that "if it exists" they would not give it

to us in still another undisguised attempt to obstruct justice. [22] The government lawyers wantonly

occluded this to all the intervening courts in overt fraud. Fortunately for "Justice", we were able

---

[22] This is an scenario suitable for default judgment against the Defendants for their flagrant
discovery violations under FRCP37, or in the alternative for severe sanctions. See United States v.
Kahaluu Construction co. 857 F. 2d 600 (9[th.cir]. 9/15/1988); Wanderer v. Johnston, 910 F. 2d 652 (9[th.Cir].
4/18/1990); Adriana International v. Lewis & Co., 913 F.2d (9[th.Cir]. 9/10/1990), and Dixon v.
Commissioner of Internal Revenue Service, No.00-70858 (9[th.Cir]. 1/17/2003).

to get a copy directly from the USMSPB and it was revealing as you may guess. From that record

we were able to acquire knowledge of the following pertinent and relevant facts which we re-

submitt for this HC to acquire judicial knowledge of:

1. That the USDE-OIG had a "Team" of experts within the agency that issued a Quality

Assurance Review (QAR) Team Report (TR)- (QARTR) of Nater's audit. In other words,

that the experts within the expert agency, had performed an audit of the audit.

2. That in that report the "Team" (Dream Team? ) chastised the only two findings that

Nater raised against the Plaintiffs. Although the record is many hundred pages long and in

another instance of obstruction of justice the QARTR has consistently been denied to us

by the USDE lawyers, (Even through the Freedom of Information Act-FOIA provisions,

see case 04-0610 (RBW) at the U.S. District court for the D.C. District), we found a page

where it reveals the following:

" Specific Observations:

1.  Based on B-CT-3-a and B-CT-3-b, the school's calculation of clock hours may have
been correct, at least prior to the 1993/94 program year. The day students went from 8:00-
1:50 (translates to six hours) and the night students went from 6:00 to 10:40 (translates to
five hours). Using 50 minutes of instruction in a 60-minute period as the basis, the OIG
took the position that day students went for five hours and the night students went for
four hours, 10 minutes. **This position could be unsupportable under appeal because it
would discriminate against students based on the schedule as shown below:**

"-If the school schedule is - 8:00-8:50, 9:00-9:50, 10:00-10:50, 11:00-11:50, 12:00-12:50,
AND 1:00-1:50–a student attends for 300 minutes of instruction and has 50 minutes of
breaks. ED would argue that the student would be credited with six clock hours of
instruction. **Therefore, why should ED take the position that a student who attends
from 8:00-11:20 and 12:10-1:50, thereby receiving 300 minutes of instruction and
having 50 minutes of breaks, should be credited with only five hours of instruction?
An ALJ could have serious problems with this concept.**

(See Exhibit 12 of the CUSDJOPR, p.53, et seq.. See p. 34, et seq., at the CVRPC, cited supra).

The logical rhetorical question that follows is: Why did the USDE lawyers occluded this report from all the courts, starting with their own ALJ, their own Secretary and all the other intervening courts? If this is not fraud upon the courts and obstruction of justice, how should it be labeled? Trying to play it smart? Playing hide and seek against a Pro Se and In Forma Pauperis individual, totally devastated and devoid of resources, including intellectual ones, according to their arrogant, uppity and sickening "Ugly American" positions against this litigant? Why the HC did not grant the Plaintiffs' lawyers timely filed petition to compel the USDE to produce the entire QARTR? Was it again induced into error by the pretext raised that this judicial review is not supposed to reach in terms of scope into evidence not before the ALJ? Well, yes, it was not before the ALJ, just as it has not been before the courts that have intervened, but simply because they occluded it. Ergo, it could not be before anyone and it will not ever be, unless the HC does what needs to be done in order to end this obscene fraud and obstruction of justice.

The QARTR was issued **before** the ALJ decision and irrefutably long before the final agency action, ergo, it was not scrutinized by the ALJ or the Secretary for one sole reason; the same one that has us filing this Motion: for the diaphanously clear fraud upon the courts and obstruction of justice of the USDE lawyers. Echoed by the USAO lawyers that limited themselves to play second fiddle, even when forewarned and forearmed by the Plaintiffs on many occasions: that they were been used and abused by their client agency colleagues. See letters to the USAO lawyers included as Exhibit 2. If the QARTR would had been issued, after the final agency decision, then perhaps it could be found not suitable for this HC's scrutiny in the instant case. But even then, at least in the interest of justice, that would be highly questionable due to the *sui generis* circumstances of the instant case. However, this is a totally moot point by now. Since

24

the QARTR was undoubtedly issued **before** the final agency decision of which the instant case is

the supposed judicial review of, it is untenable, unbearable, and unjust that the HC may let the

Defendant lawyers get away with this vulgar fraud upon the courts and obstruction of justice.

"Where the moving party has been prevented from presenting the merits of his case by the

conduct of which he complains, Rule 60 (b) relief is most appropriate. Clarke v. Buckle, 570

F.2d 824 (8[th.Cir]. 1978); Patapoff v. Vollstedt's Inc., 267 F. 2d 863 (9th.Cir.1959). For the purpose

of doing substantial justice , Rule 60 (b) motions must be liberally construed. See United States

v. Gould, 301 F.2d 353,357 (5th.cir.1962)." Quote from Ervin v. Wilkinson, 701 F. 2d 59 (7[th.Cir].

1/13/1983), pages 2-3 of 4, ¶ 19.

6. Not that we feel it necessary in view of all the evidence above, but in view of the *fait*

*accompli* that the courts heretofore, have almost mysteriously and inexplicably been induced into

deciding this issue for the Defendants, even amidst all the overwhelming, clear and convincing

and even beyond doubt evidence cited here and elsewhere, we are compelled in terms of the few

but substantial QARTR excerpts that we were able to get a hold of, to include the following. In

one of the pages that Nater included in his USMSPB record there is one that states, ad verbatim:

> " **The Team indicated that sufficient, competent and relevant evidence in support of**
> **finding #1 was not obtained. They commented that: ..."the work papers did not**
> **provide sufficient evidence to convince a cold reviewer that the school (sic) violated**
> **the spirit of the regulations."** (See Exhibit 13 of the CUSDJOPR, page 54, et seq.)

If the own expelled USDE-OIG-AIC, cited this excerpt from the QARTR in his response to the

QA Team Findings IEU ACN 02-40075, totally exonerating the Plaintiffs as we have grown

almost tired of reiterating, what additional cheap pretext could the USDE lawyers have in order

to justify their multiple assassination of the Plaintiffs as a consequence of their upholding of the

fabrication of this evidently vicious "finding"? What pretext they have to justify their fraudulent

representation to the U.S. Congress first, and to all the courts second, that the Plaintiffs allegedly

stole millions dollars from the federal fisc based on this "finding"? That is the question.

Our contention here is relatively facile to understand. The above are mutually exclusive.

If Nater's imputations were correct, why was he expelled? If they were wrong, why have them

been upheld? To be or not to be, that is the question. If their own QARTR forwarned and

forearmed the OGC lawyers in that Nater's audit would not pass their own ALJ muster, what

explanation can they give to their vicious pressing for these fraudulent charges or "findings",

amidst all the evidence that contravened such a malicious prosecution? That is the question. Why

did the OGC lawyers flouted against their own audit experts of the QARTR and their own

Administrative Law Judges' *stare decisis,* affirmed by their own Secretary?

7. Amidst all the above corroborated dirty tactics and ill-efforts by the USDE lawyers, the

ALJ decided this issue also in IEU's favor. See In The Matter Of IEU, Docket Nos.96-28-ST;96-

93-SP and 96-103-SA, where he decided against the USDE again regarding this issue and stated:

> " **IEU justifies its method of determining clock hours by explaining that since its day
> students receive 300 minutes of instruction a day, and the increments of instruction
> are divided into 50-minute periods, it is only natural to divide the total number of
> minutes of instruction by 50 to arrive at the proper number of clock hours. It is
> adamant about not including non-instructional time in the clock-hour computation
> because to do so would result in a higher fee for its students...**
>
> **SFAP's failure to include the 50 minutes of non-instructional time IEU allows each
> of its day program students, and the 20 minutes of non-instructional time for the
> night students, in the computation of the program's clock hour suggests that the
> Department is interested in preventing a school from providing a continuous stream
> of lectures, without the benefit of a break.** Perhaps this is premised on the concern for
> the value of such non-stop class time. .. **If the non-inclusion of non-instructional time
> in the clock hour computation is based on this theory, then this appears to be a
> venture by the Department to exercise direction over IEU's curriculum or program**

of instruction, which is expressly prohibited. 20 U.S.C. Section 3403;[23] See also 20 U.S.C. sections 1232-A, [24] 5899. [25]

**The arrangement of instructional and non-instructional class hours is not a Departmental concern, but one within the province of a state licensing body or accrediting .**

Another theory which SFAP may be pursuing here is its interpretation that the clock hour definition in Section 600.2 requires the 50-60 minute class and any resulting 0-to 10-minute non-instructional time to occur within one consecutive 60 minute period, as

──────────────────────

[23] Section 3403

(B) Curriculum, administration, and personnel; Library Resources
**No provision of a program administered by the Secretary or by any officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, ...."**

[24] Section 1232. Regulations

(a) "Regulation" defined
    For the purpose of this section, the term "regulation" means any generally applicable rule, regulation, guideline, interpretation, or other requirement that -
(1) is prescribed by the Secretary or the Department; and
(2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program.

[25]

"Section 5899 State and Local Government Control of Education
(A) Findings...
        7) Public Law 96-88 specified that no provision of a program administered by the Secretary of by any other officer of the Department of Health, Education and Welfare (Footnote 1) shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any, accrediting agency or association ...(Footnote 1)
(B) Reaffirmation
        The Congress agrees and reaffirms that the responsibility for control of education is reserved to the States and Local School systems and other instrumentalities of the states and that no action shall be taken under the provisions of this chapter by the federal government which would, directly or indirectly, impose standards or requirements of any kind through the promulgation of rules, regulations, provision of financial assistance and otherwise, which would reduce, modify, or undercut state and local responsibility for control of education."

opposed to being aggregated as discussed above. **If this is SFAP's position, it is based on an ambiguous change to the regulation which leaves the regulation subject to further contention. Although the secretary indicates a clock hour of instruction should occur in a "discrete 60 minute period", the regulation is quite not so precise. Requiring that the non-instructional time immediately follow a distinct 50-minute period of class ignores the realities of the dynamics of classroom behavior involving classes of two or more consecutive hours in length.**

The problem faced with IEU would had been avoided (sic) if it had not aggregated the periods of non-instruction, but rather attached them to the end of each 50-minute segment of lecture. However, I believe it retains its discretion, absent a contrary ruling by its accrediting agency or licensing body. **Accordingly, I find that IEU has not overstated its clock hours to the extent advocated by SFAP because it should be permitted to use the combined total of its instructional and non-instructional time to arrive at the clock hour figure. .."**

Ergo, as any impartial and objective evaluator can easily corroborate, the Defendants could not persuade after all, still even another of their own ALJ's (a different one from the above cited cases) that there was any sense, logic, much less reason, in their by this time sickening and vexatious posit regarding this issue. As to why the USDE Secretary ended revoking his ALJ's in terms of this issue, and in so doing providing for a clear disparate treatment, since no other institution in the history of the USDE has been imputed these liabilities for this "finding" as the Plaintiffs have, is definitely one of the reasons why there are genuine issues of material fact in the instant case that does not make it suitable for summary judgment, much less for the Defendants. This should be even more apparent, if the HC actually takes into consideration as it should, that the Secretary simultaneously revoked his ALJ in terms of the most significant issue here: the termination of eligibility of the Plaintiffs. Just as a reminder, the Secretary while evidently revoked his ALJ erroneously as to this clock hour "finding" issue, also incongruently and contradictorily revoked his ruling in terms of the eligibility issue determining that "termination is unwarranted or lack of intentional wrongdoing". See Final Decision of the

Secretary of October 28, 1997 at Exhibit 26 of the CUSDJOPR at p.66 et seq., cited supra, affirmed on January 9, 1998, Exhibit 27 of the same CUSDJOPR, at p.67, et seq. .

Since all of the above have not heretofore been sufficient for this HC to at least allow a bare-raw modicum of discovery, find a need for a hearing in the instant case, much less to grant summary judgment for the Plaintiffs as all of the above evidence commands, we must stress here and now where the fraud upon the courts is even more patent in terms of this issue in particular. As our final argument in this vein, we need to denounce the fact that the USDE's lawyers also committed fraud upon the courts by deliberately omitting to all of them that, at the time USDE's Acting Compliance and Enforcement Director (CED), Mr. David Morgan, also a lawyer, in his unripe and improvident Letter of Termination of Eligibility to the Plaintiffs of March 12, 1996, (eventually revoked as we have just seen), specifically had stated that even under the revised regulations, of July 1993, a clock hour could continue to be a 50 minute period. Let us review the excerpts of the text *ad verbatim* of the Letter that are definitely pertinent and relevant to this discussion. They constitute, vivid proof of what we have elsewhere labeled "the epitome of arbitrariness".

" The revised regulations became effective on September 7, 1993.[26] Under the regulation,

_____

[26] At p. 29 of the transcript of the administrative hearing of October 22, 1996 we find the following confession by the USDE OGC'S lawyer: **"As the tribunal knows, there may have been ambiguity in the definition of a clock hour.** But effective September, 1993, any ambiguity that may have existed was clarified. Since that time there can be no question that a clock hour equals 60 minutes. Accordingly, *that is the standard which IEU must comply.*" As anyone can corroborate the USDE OGC lawyers were not only responsible for the violation of IEU and its entire community's civil rights under 42 U.S.C. 1985 by intimidating our announced witnesses and suborning the perjury of Lugo and Rios, but committed perjury herself. The problem with this statement is that this is not what we find in the decision of the USDE own ALJ in in IN RE MBTI, affirmed by the Secretary. This constitutes beyond doubt evidence that the OIG and the OGC lawyers confederated to violate the Constitutional, and Civil Rights of the institution and their entire community, in open contempt and blatant disregard of the own

the following are acceptable methods for institutions to structure periods of instruction:

**(1) Instructions for 50 minutes** with no preceding or subsequent classes is acceptable as one clock hour of instruction; instruction for 60 minutes with no preceding o subsequent classes is also acceptable as one clock hour of instruction.

**(3) Instruction for 50 minutes** with no preceding class, followed by 10 minutes of non-instructional time with subsequent classes 50 minutes in length, each followed by 10 minutes of non-instructional time, is an acceptable schedule. Each 50-minute period would total a clock hour.

**(4) Instruction for 50 minutes** with no preceding class, but with a subsequent class of instruction immediately following, is an acceptable schedule. However, 10 minutes of non-instructional time must follow the second class and all subsequent classes. In this instance, each 50-minute period would total a clock hour. This is acceptable because non-instructional time precedes the beginning of the first class. Thus, under the regulation, the first two periods of instruction may run consecutively."

Ergo, as anyone can see, a clock hour could be a fifty minute period after all, whenever the USDE officer in charge of this *ultra vires* atrocity felt like it. We respectfully invite this HC to make an introspection and tell us if in all the years of experience it has dealing with the interpretation of regulations and more especially with the application of unambiguous regulation interpretations such as the one in "controversy" here, it has encountered itself with a case with a more arbitrary, capricious and not in accordance with the regulations *per se* setting such as the

---

USDE ALJ's decisions.

" I heartily accept the motto,-"That government is best which governs least"; and I should like to see it acted up to more rapidly and systematically. Carried out, it finally amounts to this, which I also believe,-"That government is best which governs not at all"; and when men are prepared for it, that will be the kind of government which they will have." - Henry David Thoreu, on Civil Disobedience, *circa,* 1849.

above, not to say absurd and senseless, again not to say hanky panky.[27]

       With all due respect, it does not gets more whimsical than this. All this with the federal officers here obviously acting with reckless disregard and deliberate, wanton and blind indifference towards the Constitutional, Civil and Human rights of 5,000 disadvantaged students and more than 500 workers, ARR and his family, all whose studies, jobs, and educational mission were annihilated by this hate crime against the Plaintiffs. For all the above stated reasons, we respectfully aver that this issue is ripe for not merely summary judgment but for default judgment against the Defendants based on the following applicable criteria as expounded by the First Circuit in Aoude, supra:

> [30] A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. (Citations)

> [31] Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms. In our estimation, however, the present case is a near-classic example of the genre. Appellant's bad faith is manifest.... The tactic plainly hindered defendant's ability to prepare and present its case, while simultaneously throwing a large monkey wrench into the judicial machinery. In our view, this gross misbehavior constituted fraud on the court. See Cleveland Demolition Co. v. Azcon Scrap Corp., 827 F.2d 984, 986 (4th Cir. 1987) (fraud on court may exist where witness and attorney conspire to present perjured testimony); Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978) (same, where party, with counsel's collusion, fabricates evidence).

---

[27] See Connally v. General Construction, 269 U.S. 385 (1926), where the Court admonished: **"....A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process law. International Harvester v. Kentucky, 234 U.S. 216** . . . The precise point of differentiation in some instances is not easy of statement; but it will be enough for present purposes to say generally that the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough to enable those within their reach to correctly apply them, Hygrade Provision v. Sherman, 266 U.S. 497 .

[33] The next question, of course, requires that we examine the options of a federal district judge confronted by such odious machinations. It is apodictic that federal courts possess plenary authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link, 370 U.S. at 630-31 (footnote omitted). The Civil Rules neither completely describe, nor purport to delimit, the district courts' powers. See HMG Property, 847 F.2d at 915; Brockton Savings Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11 (1st Cir. 1985), cert. denied, 475 U.S. 1018, 89 L. Ed. 2d 317, 106 S. Ct. 1204 (1986). Rather, the district courts retain the inherent power to do what is necessary and proper to conduct judicial business in a satisfactory manner. As we have said, that inherent power is "rooted in the chancellor's equity powers, 'to process litigation to a just and equitable conclusion.'" HMG Property, 847 F.2d at 915 (quoting ITT Community Development Corp. v. Barton, 569 F.2d 1351, 1359 (5th Cir. 1978)). The courts' inherent power includes "the ability to do whatever is reasonably necessary to deter abuse of the judicial process." Eash v. Riggins Trucking Inc., 757 F.2d 557, 567 (3d Cir. 1985) (en banc); see also Brockton Savings Bank, 771 F.2d at 11.

[34] There is an irrefragable linkage between the courts' inherent powers and the rarely-encountered problem of fraud on the court. Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system. As Justice Black wrote in a case involving a not-dissimilar fraud:

[35] Tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

[36] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 88 L. Ed. 1250, 64 S. Ct. 997 (1944).*fn2 All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process -- to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would, we think, foster the very impotency against which the Hazel-Atlas Court specifically warned.

[37] We find the caselaw fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court. The Supreme Court said so in Hazel-Atlas, albeit in dicta. Id. at 250. The most closely analogous cases we can find, in our own circuit and in a variety of other courts, stand for much the same proposition. See, e.g., Brockton Savings Bank, 771 F.2d at 11-12 (affirming district court's entry of default judgment under court's inherent powers in response to defendant's abusive litigation practices); Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983) ("courts have inherent power to dismiss an action when

a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice"); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D.Ky. 1986) (where fraud committed, court has "inherent power [to dismiss] . . . to protect the integrity of its proceedings"); United States v. Moss-American, Inc., 78 F.R.D. 214, 216 (E.D. Wis. 1978) (similar); see also C.B.H. Resources, Inc. v. Mars Forging Co., 98 F.R.D. 564, 569 (W.D.Pa. 1983) (dismissing under Fed.R.Civ.P. 41(b) where party's fraudulent scheme, including use of a bogus subpoena, was "totally at odds with . . . the notions of fairness central to our system of litigation"). In most of these cases, we hasten to add, the challenged conduct seems, arguably, less reprehensible than in the case at bar.

We respectfully paraphrase and adopt as ours the final words cited above: "In all of the above cases, the challenged conduct seems less reprehensible than in the case at bar."

In view of the aforementioned, we respectfully pray for the default or summary dismissal of this issue and the imposition of severe sanctions against all the attorneys for their conduct unbecoming of a lawyer, most especially a U.S. Government lawyer. "We recognize that the status of a government attorney is unique. In United States v. Sumitomo Marine & Fire Insurance Co., 617 F. 2d 1365 (9[th.Cir.] 1980), we emphasize that harsh sanctions are in order if the disobedient party is the government because those charged with enforcing the law should set an example in obeying the law. Id. at 1370. " United States of America v. National Medical Enterprises, 792 F. 2d 906 (9th.Cir.6/23/1986), page 7 of 8.

Again, paraphrasing the Honorable First Circuit:

Here, all attorneys made an affirmative misrepresentation to the courts, which did not comport with their duty of candor. See, e.g., NHRPC 3.3(a)(1), comment ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."); In re Tri-Cran, 98 B.R. at 616 ("`Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.'") (citation omitted); cf. Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994) ("Every lawyer is an officer of the court . . . [and] he always has a duty of candor to the tribunal."); United States v. Shaffer Equip. Co., 11 F.3d 450, 457 (4th Cir. 1993) ("[A] general duty of candor to the court exists in connection with an attorney's role as an officer of the court."); cf. also Erickson v. Newmar Corp., 87 F.3d 298, 303 (9th Cir. 1996) From Pearson v. First NH Mortgage Corp., 200 F. 3d 30 (1[st.Cir.]12/29/1999), ¶51.

**In terms of the "Excess Cash Finding Issue"**

Since the outset we denounced that this finding was wantonly, heinously and egregiously inflated on purpose. In this vein, all the government officers, lawyers included, accommodatingly ignored the "excess cash " section in the Notes to The Financial Statements of the unqualified or "clean" opinions by the independent C.P.A. firms that performed the Plaintiffs external audits. Among them, the up-to-then best reputed firm in the world for Colleges and Universities; KPMG Peat Marwick (KPMGPW) and the best reputed local firm for non-profit organizations; Valdes, Garcia & Marin (VGM). One of the basic reasons why there are genuine issues of material fact in controversy here is the *fait accompli* that the external audits by true independent auditors, not only controvert and contradict but belie those of Nater, who was not only, not independent, but was dependent on the USDE, at least until he was expelled. Besides the fact that these external audits, by these truly independent accountants, controverted and contradicted this "finding" by expelled USDE-OIG-AIC Nater, the latter was not only criticized but even chastised by the cited above QARTR of the own USDE's experts within the agency paid to specifically detect and denounce the errors and negligence in audits such as this.

The fraud upon the courts regarding this issue lies in the *fait accompli* that the first government lawyers who intervened obstructed justice in the nature of a conspiracy and the second neglected to prevent that conspiracy (see 42 U.S.C. 1986), by occluding to the courts that the QARTR, went as far as denouncing in writing in terms of this specific "finding" that: "...the logic is faulty" and is "not supported by the working papers". (See Exhibit 12 of the CUSDJOPR, page 53, et seq.. See also pages 35-36 at the CVRPC, cited supra).

"2.The audit work papers contain two different methods for calculating imputed interest.

D-1 calculates interest on a daily basis, **but the logic is faulty**. D-1-1 calculates interest on a six-month basis **which cannot be justified**. The report says we calculated interest on a monthly basis. **This statement obviously is not supported by the work papers."**

The above assessment by the real USDE experts in charge of evaluating this issue, (certainly not the lawyers), perfectly coincide with the Plaintiffs arguments all throughout these tainted proceedings. Expelled USDE-OIG-AIC Nater artificially and maliciously inflated this finding by using "posting dates" data to purportedly support it, [from a non-accounting, Management Information Systems (MIS) tool as his source], instead of the effective "credit dates", (from the true and valid accounting information systems tool he should had used; the accounts receivable ledgers). Since we have elaborated on this issue before in many of our written submissions to the HC, we will reduce our present argument to explain by analogy how and why this imputed "finding" is inherently flawed, dead wrong and consequently went awry before the eyes and minds of the objective USDE-OIG-QARTR expert evaluators. Taking the "posting date" as the basis to calculate this "excess cash finding" instead of the effective "credit date" is equivalent to a court taking the "entry date" instead of the "filing date" of the filed motions in any given case as its basis to calculate the days that those motions were filed late. Even a non-lawyer like myself has learned that the valid date is the date when the document is filed *de jure*, not when it is entered *de facto*. By the same token, the HC does not even need to be literate in accounting matters to understand that if the date the credit is posted *de facto* in the accounts receivable ledger is used as the basis to calculate the amount of excess cash incurred into, instead of the date when the credit is effective *de jure* ( when the payment or credit is due and payable, legally), the dispersion in the dates is obligatorily going to lead to a mathematical artificial inflation. Have no doubt about it.  The question that naturally follows, is again, why did the USDE- OGC lawyers

flouted at their agency experts from the QARTR recommendations, forewarnings and

forearmings? That is the question.

To make the wrongful treatment of this issue even more pathetic, the following excerpt

from our Statement of Contested Facts, illustrate how the imputed liability was grossly inflated

amidst the fact that in the corresponding section of the written report by OIG-AIC Nater, he

almost graciously conceded and recognized the accuracy of the Plaintiffs' system of accounting

for this particular concept.

> "11. d. The USDE's also deliberately omits from its "Statement of Uncontested Facts", the uncontested fact that AIC Nater in the corresponding working papers related to this issue, totally contradicted his finding when he wrote, in his own handwriting:
>
> " Purpose: To test if students pmt.(payment) as per the Ledger Card (Tarjeta De Estudiante) are actually traceable to a Pell Disbursement List (Nomina y Posteo Pell) as indicated in the Ledger Card.
>
> Source: Information provided by Jose Ruiz-Fiscal Officer for Inst. ED Universal-Student's Ledger Card, and Pell G.; SEOG Disbursement Lists prepared by IEU.
>
> Scope: As part of our Cash Management review we asked Jose Ruiz the explanation for the method he use (sic) to request funds. As of Friday 26 of August Jose explained to Porfirio Rios (ED-auditor AAS and myself (R,. Nater-AIC) the following:
>
> After the school enroll a student and the determination he will receive Pell is done, the school estimate the pmt. To be made to each student. Such estimate is base (sic) on the dates the student is expected to complete the require (sic) clock- hour for the pmt.
>
> Also, Jose explained I.E.U. prepared a Ledger Card (Tarjeta De Estudiante) for each student; a pmt. List is also prepared for each student under each F.A. program. The actual pmt. Has effect at the date of the posting (List of credits to account which is known as "Registro de Posteo Electronico de Becas Pell"). This register (computer generated) is dated and signed by the IEU officer in the accting. Department authorized to do so. So the flow of the method is: the Financial Aid office prepare(sic) a list of program funds disbursement (which is prepared in accordance to the student enrollment status; the copy is forwarded to the accounting dept. which actually review the acct. and is who actually post the pmt. To the student account. The posting to the individual Ledger Card is done
>
> through the Computer. The date use(sic) is called the "Reference"(REF). That date actually refers to the date the posting register take effect as well as the date the posting to the "Ledger Card"is made. As to that we noted the Ledger Card include (sic) a date entitled 'Transaction Date" (Fecha Trans.). Jose Ruiz explained that the date the student

was able to receive the program pmt. The base for that date is; for 1st. Pmt. IEU post the class start date; the other dates are based on the expected time the student would have completed the required clock-hrs for the pmt. As estimated. This best estimate is based on the length of the program and the daily class schedule of 6 clock-hr/day for day student (sic); 5 for night students)

According to the explanation we wanted to review if the transactions in the student's ledgers were actually accurate and traceable to the accounting records **To this end we traced 34 transactions which included tracing info from the student ledger-Pell + SEOG- to the accting records (Registro de Posteo). Also, we verified info. In the Pell G. Pmt. Summary.**

Test Results:

**Except for two exceptions, all the transactions were traced to the records and the information was accurate.** However, for one student (#17) we noted we were not able to trace a Pell recovery to the inst. Records, but we traced posting of the pmt. twice-nevertheless Pell Pmt. Sum accounted for only one pmt

Thus no effect on Fed funds. Other exception was noted (#(). For this student it appears I.E.U. could have made two pmts from Pell 91-92 but it actually made one pmt., nevertheless it informed and requested funds for two pmts from ED. The two pmts appear to be acceptable, however, since it was (sic) not made before the close of the A.Y. the payment ($1,200) should be refunded to ED and the auth. For that A.Y. (91-92) should be reduce(sic) for the same amt. No other exceptions were noted.

Conclusion: **Two isolated exceptions were noted.; the system of posting pmt in the "Registro de Posteo" and them posting it to the student acct card"provides accurate and traceable info.**

In accordance to our review a Pell pmt. for $1,200 should be refunded to ED. And the authorization reduced likewise.

**Thus, transactions related to the Fed program reflected (posted) in the student ledger card are traceable to the Disb'mt list and to the Posting List. "**

Signed Auditor AIC Rafael Nater - Sept. 01, 1994.

Supervisor Porfirio Rios Rojas - 1/13/95

Manager Thomas Whiting - 6/20/95

See OIG Working Papers Index D-6 Pages 1-5, Exhibit 18 here."

As to why the above written statement by Nater in his report found as part of his audit "work papers", totally contradict the contents of this "finding", is a proper question to ask the expelled auditor. But we were never able to do that simply because the USDE lawyers also occluded from

us and from the ALJ that they had fired him. In lieu of him, they produced Rios, and

misrepresented to the ALJ that Rios could speak for AIC Nater. Review footnote 14, on p.13,

infra. This is why in the eventuality that the HC does not grant us the default or summary

judgment hereby requested, in the alternative, we pray that it allows us the necessary modicum of

discovery needed to unmask this travesty of "Justice".

> ...On the contrary, whatever authority does exist suggests that once the record evidence demonstrates a "colorable" claim of fraud, the court may exercise its discretion to permit preliminary discovery and evidentiary proceedings. See, e.g., Hall v. Doering, 185 F.R.D. 639, 644 n.4 (D. Kan. 1999) (fraud on the court); cf. also, e.g., Rothenberg v. Kamen, 735 F.2d 753, 754 (2d Cir. 1984) (settlement procured by fraud).

> [35] In fraud cases, the "colorable claim" standard is more appropriate than the "smoking gun" standard because **claimants who have been denied both preliminary discovery and an opportunity to present witnesses may well be left with no meaningful access to direct evidence of fraudulent intent**, notwithstanding an abundance of telltale circumstantial evidence. *fn2 In such circumstances, trial courts must be vested with adequate discretion to determine in the first instance whether the particular facts warrant discovery and post-discovery proceedings. Quote from Pearson v. First NH Mortgage Corp., 200 F.3d 30 (1st.Cir. 12/29/1999), cited supra, ¶ 34,35.

Also we must add that at the time of the facts that brought about this controversy, [more than

eleven (11) years ago], our computers did not run "on line" and these issues of cash forecasting,

request of funds, and their justification in audits simply did not evolve the way they do today.

The own U.S. Attorney, in the USDE's Motion for Summary Judgment of September 1996 in the

previous case 96-1893 (JAF), at p.9, described what were the then applicable accounting rules:

> " **Under the advance system, the Department provides funds to an institution before the institution pays student beneficiaries. In general, the Department provides these funds based simply upon an institution's request for them. An institution is <u>not</u> required to account to the Department fro these payments <u>before</u> receiving them. An after-the-fact-accounting is provided through a required annual audit. 34 C.F.R. section 668.23.**" (Underlined in the original).

As the HC will be able to corroborate, this "finding" was so brutally inflated, so much so, that it

ended not making any sense; accounting wise, financially wise, mathematically wise, and of

course, legally wise. Another perfunctory review of the "finding" will reveal that it was so

inflated that it became what we have labeled as a "mathematical impossibility". We timely raised

this point to the USDE officers, again to find their customary prepotent posture of irrationally

taking for granted their auditor's position even when they ended expelling him after the fact.  The

imputation of the liabilities of this "finding" used as basis an "average monthly excess cash"

figure of $1.3 million. However, the average monthly cash figure of **all** funds received was about

$700,000. This entails that as a result of the wrongful use (or shall we say abuse) of the "posting

dates" instead of the "credit dates" by expelled AIC Nater, (as if in the example above the court

used the "entry dates" instead of the "filing dates"), the result was that the average monthly

excess cash figure resulted into being almost double than the average monthly cash received in

totality.

    The following is an excerpt from our Statement of Contested Facts which we import

because of its pertinence and relevance here.

> 11. "*Contrary to the requirement that schools disburse funds within three-days of receipt discussed herein infra, the OIG found that IEU requested and received federal funds in excess of disbursements by an average amount of $1,337,577 per month during the audited period.(Citation)*."(SOUF at 5).
>
> 11a.. This is one of the genuine issues of material fact more in controversy in the instant case because as IEU has grown almost tired of claiming this finding is an absolute improbability  mathematically speaking and thus, should not pass this Honorable District Court's most lenient muster in terms of quality of evidence. Just to illustrate this Honorable Court, if IEU received a total of 28.3 million dollars in funds for the 36 months comprised in the audit and that represents an average of some $786,000 a month of total funds received, how can someone pretend to justify that IEU "**requested and received federal funds in excess of disbursements by an average amount of $1,337,577 per month during the audited period**" See June 10, 1996 Initial Brief of Respondent at page 9. Document # 00570 of this Administrative Record, Docket No. 96-

28-ST. As anyone would concede, this is a mathematical improbability and impossibility. It is simply improbable and impossible that IEU could have an average excess cash per month that almost doubled the average of average total cash per month. With this fact and nothing more, it should be more than enough to demonstrate beyond doubt that at least there is a genuine issue of material fact in controversy here, notwithstanding this, there are many other factual discrepancies we have with the defendants regarding this issue.

Mere elementary school division is all that is needed to corroborate this fact. We respectfully invite the HC to do its own math on this one. No wonder that the QARTR labeled this finding as one where the "logic is faulty". But besides the obvious lack of mathematical sense, ergo, scientific soundness of the "finding" itself, we must stress that the USDE lawyers disingenuously to say the least, responded to our timely and responsible denunciation of this accounting brutality with their customary imbrutage. The USDE lawyer in charge of responding (Ms. Gil Montero, with the backing of all her superiors) limited herself to argue that "... the average monthly excess cash is not computed in the same manner as the monthly average of total funds." See Response Brief of the SFAP's of April 4, 1997, at p. 5, ¶ 1.[28] In other words, that one does not need to divide by twelve (12), to reach an average **monthly** figure!!

The above preposterous argument exemplifies the character of the fraud upon the courts and the obstruction of justice in the instant case since the outset. It is also symptomatic of the degree not only of the total disdain and disregard for the Plaintiffs Constitutional, Civil and

---

[28] In that same Brief, the SFAP argued against our timely raised defenses regarding this issue with conclusory allegations, speculation and improbable inferences in terms of the "carry-over" funds and claimed that the "tolerance levels" of excess cash published in the USDE's Blue Book (Accounting), were not available for the Plaintiffs since they were issued on July 1995. This is another instance where the bad faith and the disparate treatment are manifest. In the case of the clock hour regulation revision used in support of their posit, which clearly did not apply to the Plaintiffs, unless applied retroactively, that was the USDE's position. In the case of the excess cash issue, where the newly revised "tolerance levels" prescribed for applied to the Plaintiffs prospectively, the USDE's was against that position. See Response Brief, sited above at p.5-7.

Human Rights, but of the lack of intellectual honesty,[29] (assuming this scenario can resist the use of this concept), by the USDE original lawyers, their superiors and successors. The worst part of this "judicial poltergeist" we have had to endure for almost en (10) years now, is how mediocre not to say poor, the government lawyers intellectual performance has been all throughout. [30] The saddest irony of all is that if mediocre and poor have been their ill-efforts to try to get away with their above monstrosities corroborated here, *idem* has been the lack of timely detection of such behavior by some of the intervening lawyers and worse by some of the intervening courts, with all due respect. This is why we have the duty not only to defend our case but to pursue our cause, not only for our own sake but for the one of anyone similarly situated now or in the future. The presumption of righteousness given to the government lawyers is rebuttable, like any other presumption, but it cannot be rebutted, if one is not given the slightest modicum of discovery,[31] and a hearing or day in court, if not a full-fledge trial. If not for "Justice" at least for the appearance of "Justice". With thoughtless railroadings and impetuous summary judgments, as

---

[29] With all due respect, we cannot understand how the courts have heretofore given credit to the government lawyers when for purely intellectual reasons, putting aside their lack of ethics and the lack of merits of their claims, they have shown such a cheap and meager performance, that they do not even deserve, not the summary judgment they have obtained heretofore, but quite to the contrary, what they undoubtedly deserve according to their dossier in this controversy, are serious sanctions for their malicious and unethical actions.

[30] " The tendency of democracies is, in all things, to mediocrity, since the tastes, knowledge and principles of the majority form the tribunal of appeal. This circumstance, while it certainly serves to elevate the average qualities of a nation, renders the introduction of a high standard difficult. Thus do we find in literature, the arts, architecture and in all acquired knowledge, (law not excluded, parenthesis ours), a tendency in America to gravitate towards the common center in this, as in other things; lending a value and estimation to mediocrity that are no elsewhere given." James Fenimore Cooper, On the Disadvantages of Democracy, From The American Democrat, *circa*, 1838.

[31] Citation from USCA1C about requisites before the issuance of a summary judgment, including "modicum of discovery" and "best foot forward".

you may concur, it is impossible to rebut anything.

It would be interesting to say the least, for this HC to see, hear and listen, including perhaps most importantly, observe and evaluate the demeanor of these government officers explaining in open court as they should, how could they rationalize (even if they were post-hoc-rationalizations) and justify this "finding", [32] especially in view of the mathematical and ergo, scientific evidence against their heretofore maintained, retained and sustained posits, and the hard evidence emanating from their own USDE-QARTR. This is one of the reasons why, in lieu of a ruling of summary judgment for the Plaintiffs as the above evidence more than justifies, we not only pray but would love to have the HC sit these lawyers to proffer their "logical" explanation for the above and illustrate us as to how they unabashedly have sustained this flawed mathematical conclusion to the courts, again and over again.

The government lawyers have proven so far that they can mess with the Plaintiffs, and somehow have gotten away messing with the courts, but they certainly cannot mess with mathematics. "But, as said by the Supreme Court, a litigant who has engaged in misconduct is not entitled to "the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent."". Minneapolis St. Paul & S.S. Marie Ry.Co. v. Moquin, 1931, 238 U.S. 520, 521, cited in Rozier v. Ford Motor Co., 573 F. 2d 1332 (5[th.Cir]. 6/5/1978), page 10 of 17.

Thus, in case the HC does not rule a default or summary judgment based on the evident fraud regarding this and the other issues, the least that we expect under the *sui generis*

---

[32] *Idem* with the others.

42

circumstances of the instant case is to allow the discovery requested above and schedule an

evidentiary hearing to allow them to bring their "best foot forward" and dispense us the same

equal treatment. No more, no less. In the alternative, we pray for the appointment of a special

master (FRCP 53 et seq.) to find from the KPMG and VGM external audits and the USDE-OIG

audit, which excess cash amount is the correct one and submit recommendations to the HC in

this vein. This is definitely an issue that by its own nature makes it amenable for a special master.

Its costs can be defrayed by the USDE from the funds unconstitutionally preconfiscated from us.

**In terms of the "Unpaid Refunds Finding Issue"**

Even when all the above issues are crystal clear in favor of the Plaintiffs, at least to the

mind and spirit of an objective, unbiased and impartial evaluator, just as any HC should be, this

specific issue serves to exemplify how perfidious and ominous the fraudulent actions of the

government lawyers here have been since the outset. Believe it or not, in terms of this issue in

specific, the actions of the USE lawyers surpass by far, the fraudulent actions already revisited

above.

1. First, the alleged "unpaid refunds" for the year 1994-95 were in-fact undoubtedly paid

just as they were for all years before. All the government lawyers have failed to provide for an

adequate explanation on why the "refunds" for the years 1992-1993 and 1993-1994 were deemed

as paid late with a resulting imputation of mere interests as liabilities and why a disparate

treatment was given to the same issue for the year 1994-95. (Similarly to what happened with the

"clock hour issue", symptomatic of an "I-admit-wrong-for-two-out-of-three-but-I-am-not-going-

to-concede -you-all- and-end-empty-handed syndrome). See the overwhelming and more than

clear and convincing evidence of the disparate treatment regarding this issue in particular in

Exhibits 2-15 of the CPRPC, cited supra and Exhibits 19 -24 of the CUSDJOPR, starting at page 60, et seq., thru p.65 et seq.. As anyone can easily corroborate the "unpaid refunds" were paid by way of a direct debit to the Plaintiffs' funds authorization first, and by way of a direct debit to the funds available second, at the Plaintiffs account under the USDE's total control. This as a result of the Plaintiffs having re-processed the payment vouchers (in Defendants' possession) of all the refund students with their corresponding adjustment or debit from the originally requested to be paid amount per each student. Most ironically, the way it was supposed to be done.

The AIC's and all the government lawyers mentioned above, have continuously and consistently committed fraud against all the courts that have intervened or have had jurisdiction over this subject matter since the hard, overwhelming, not only clear and convincing but beyond doubt evidence, emanating from official USDE documents, demonstrate again *ad nauseam,* that the refunds were paid, regardless of the fact that some of them were admittedly paid late.

2. Second, the hard evidence submitted in the instant case proves without doubt, not only that the "unpaid refunds" were paid, but it proves: when, for how much, with the specific social security number of each student whose refund was involved, the date, their names, the amount refunded, the specific batch number of the Institutional Payment Number (IPS) through which it was processed and in brief, all the data that any reviewing court may need to corroborate that the Plaintiffs claims and defenses in support, both quantitatively and qualitatively, repudiate easily the Defendants outrageous posit. Actually, a review of the data timely produced by the Plaintiffs demonstrate without a doubt, not only that almost all of them were paid, albeit some of them late, but that the data provided by the Plaintiffs to the USDE-IRB's corrupt auditor Lugo, can be easily corroborated to have been 99.37% accurate, in terms of what was represented to the

auditor back at the time of the audit and what the official data in the official documents of the USDE serve to validate and to verify .

Of all the "findings" in the instant case, all of which are as presumptuous as only sick and racist minds with invidious discrimination can concoct or fabricate, this is the most inconceivable. As we have stated elsewhere citing the U.S. Supreme Court adopted concept of "shocks the conscience" in the seminal case Rochin v. California, where the accused was induced by the federal agents to vomit in order to obtain evidence, in the instant case, the evidence is so pellucid that the Defendants' unconscionable posit in this vein induces one to vomit. ("Every time I hear the word "Justice" it makes me vomit"-Honorable Judge Lerner Hand?).

The fraud to the courts in regards to this issue lies in the following:

1. The lack of any evidence contrary to the above. The HC, upon giving the due consideration it should to this Motion, very respectfully, shall not overlook the fact that the Defendants did not produce an iota of evidence to counter, much less to persuade it against the overwhelming evidence in support of the Plaintiffs posit in this vein, that is besides mere conclusory allegations.

2. The fact that AIC Lugo evidently was suborned to commit perjury and committed perjury. The Defendants not only have not controverted or disputed this genuine issue of material fact, but they have not even addressed the issue to the HC, nor could they simply because they have been caught off-guard in terms of it. (See infra, p.46)

3. There is no probable nor possible way that the Defendants could have proved before their ALJ nor can they prove in this HC or any for that matter, that the Plaintiffs did not pay the

viciously imputed "unpaid refunds." This setting is what has prompted us to elsewhere denounce that the only evidence that we have yet to produce regarding this issue are the "prepuces and hymens" of the refund students involved. We pray that the HC excuses us for having used this Freudian slip, in order to dramatize our indignation, but we remind it that it was used before another forum and not this. We are only quoting a statement made out of the HC. We respectfully expect the HC to understand and comprehend, in case it cannot justify our choices of figures of speech, that after struggling for more than ten(10) years and beseeching for a single day in court to unmask the above barbaric actions performed with perfidy and which assassinated our character and virtually everything else, provoking the opprobrium and the stigma that has haunted us for all these years, there are occasions when one gets really desperate.

For all the above reasons it is crystal clear that the Defendants have heretofore being able to prevail in these proceedings due to what I have denominated the "presumption of righteousness" that everyone, not the courts excluded, dispense to the government representatives. In the instant case, the hard, overwhelming, clear and convincing, and even beyond doubt evidence demonstrate, *ad nauseam*, that these federal officers have not only been mediocre at best in their compliance of their ministerial duties, if not willfully negligent or incompetent altogether, but even worse, they have repeatedly committed open fraud upon the courts. Whether consciously or not, wantonly or not, heinously or not, sentiently or not, it is a question we shall defer for this or whatever court of law ends up evaluating our serious denunciations here.

"Fraud on the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the

judicial system's ability to impartially adjudicate a matter." Auode, cited supra, 892 F.2d, at

1118, quoted in Fernandez v. Leonard, 963 F.2d 459, 462 (1st.Cir. 1992), Pearson, 201 B.R. at

501 (Fraud on the court is an "intentional deflecting of the Court from knowing all the facts

necessary to make an appropriate judicial decision on the matter before it.") (citing Tri-Can, 98

B.R., 609, 615-616 (Bankr. D. Mass. 1989))." Quote from Pearson v. First NH Mortgage Corp.,

200 F.3d 30 (1[st.Cir]. 12/29/1999), cited supra, page 7 of 13, ¶ 47.

**The Suborn Perjury, Perjury, Intimidation of Witness and Obstruction of Justice by the**
**USDE lawyers.**

1. The hard objective evidence of the instant case serves to demonstrate without any

doubt that in addition to the above wanton, egregious, heinous and deliberate obstruction of

justice already fully proven above, the Defendant lawyers, not confident in that the above was

enough to achieve their ill-purposes and agenda, went a little further by suborning the perjury of

IRB-AIC Felix Lugo. See pages 15-27 of the CVRPC, cited supra, where this allegation is

proven also *ad nauseam* and beyond doubt.

2. The intimidation of witnesses came about when the OGC lawyers called to deter the

testimony of the pre-announced witnesses to the administrative hearings by the then appearing

Pro Se, without legal counsel and naively without any previous experience, ARR, for the

Plaintiffs, of whom they obviously took advantage of in view of his virtual defenselessness. See

pages 10-15 of the CVRPC, cited supra, where this allegation is proven also *ad nauseam* and

beyond doubt as a result of the confession for the record of USDE attorney Russell Wolff, Esq..[33]

---

[33] Coincidentally, all the intricacies of this controversy resemble more those of the theater of the
absurd, made famous by the great play writer, Edward Albee, in his masterpiece "Who's Afraid of

This intimidation of witnesses was confessed for the record when as a reaction to the Plaintiffs'

ad hoc counsel for the hearings, (B.F. Cerezo) timely objection and denunciation of this fact at

the start of the first day of hearings. Attorney Wolff was so boastfully arrogant, not to say

imbecile, that he admitted it for the record. Let us see what Wolff bragged about when BFC

denounced the witness intimidation to the ALJ that theretofore we thought had been

implemented by attorney Ms. Gil-Montero only. See Shepherd v. American Broadcasting Co.,

D.C. Circuit, 94-7141, 8/28/95.

**Yes. In fact the functionary that counsel (referring to BFC), is referring to is my co-counsel (referring to Ms. Alexandra Gil-Montero, Esq.) who specifically did knowingly, in my presence, properly (sic) contact two independent public accountants who appeared on a witness list that Respondent presented to both the Department and to this Tribunal.**

**It would had been improper (sic) for the Department not to contact these individuals who are to appear before this Tribunal as witnesses, and request opportunity to speak with them.**

Clearly the Department did not contact the school, the school officials, anybody that counsel would be representing. We would not contact respondent. (Thus the ratification of the ex-parte communication with the witnesses - He confesses he would not contact Respondent-Ruiz Rivera who was appearing Pro Se for the Respondent- Note ours).

Similarly we would not allow them to contact someone that we purported as our client, for purposes he described to us. (In other words, they could "properly"contact our witnesses ex-parte and not contacting them would had been " improper" but he confessed that he would not allow the same *contrariu sensu*- Our note).

But an independent public accountant has a duty to talk to the Department, as our regulations specifically say. It's the duty to present its work papers for our evaluation. (Of course, ex-parte, to intimidate and coerce at will- Note ours). **And certainly, not only was it not improper, but it was necessary that the Department contact these two individuals.** " (Regardless of the Federal Rules of Civil Procedure, the Canon of Ethics,

---

Virginia Wolff?" This is why we have demonstrated that we are not afraid of Russell Wolff, much less of his insidious machinations *a la* any of the drunken characters in the above play.  Instead of Kafka-esque as the Honorable Judge of the Federal Claims Court labeled the San Juan City College case, cited supra, the instant case could be labeled Albee-esque.

and the Civil Rights Act. Commentary ours). [34]

3. This intimidation of witnesses, an overt violation of the Civil Rights statute, proved to be profitable to the Defendants inasmuch the Senior Partner Vicente Leon, of external auditor, C.P.A. firm, KPMG Peat Marwick's, shied away from his professional obligation to defend his firms' audit. This shying away is part of the Plaintiffs claims in related case 03-1366 (SEC) which was dismissed without prejudice for lack of the payment of the docket fees and that it is contemporaneously being re-filed. The fact that the USDE was a major client of KPMG with many millions of dollars in payments for services involved, most probably acted as a catalytic agent of Wolff's and Gil Motero's intimidation of pre-announced witness C.P.A.Vicente Leon who certainly did not act as his last name suggests.

In case more was needed to prove our claims, averments and defenses  here, we are obliged under the circumstances to denounce that we timely raised various if not all of these very serious issues to the pertinent attorneys that played a primary role in the incidences of the instant case alluded to throughout this Motion.

1. See Complaint for Violation of the Rules Of Professional Conduct (CVRPC) at the

---

[34] This confession by Wolff of his outwardly admitted conspiracy with Gil Montero violates 42 U.S.C. section 1985 of the Civil Rights act that states literally:

Section 1985. Conspiracy to interfere with civil rights
(2) Obstructing justice; intimidating party, witness, or juror
If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, ...; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

Office of the Bar Counsel (OBC) of the D.C. Bar against the intervening USDE lawyers. (Exhibit 1). That Complaint was dismissed with the pretext that the issues presented were part of *sub judice* and *pendente lite* cases. We moved for *Mandamus* at the U.S. Court of Appeals for the D.C. Circuit (USCADCC) and it dismissed for want of subject matter jurisdiction not before referring us to file it at the D.C. Court of Appeals where we are re-filing it contemporaneously. See 04-1397 at the USCADCC.

2. See Letters to the U.S. Attorney forewarning him that his staff had been derelict in their duties by not having sifted the evidence of the case and having acted as mere rubber stamps, sounding boards or dummies of the client agency lawyers (USDE). (Exhibit 2).

3. See August 26, 2004 Complaint against the U.S. Attorney's Office lawyers filed before the U.S. Department of Justice Office of Professional Responsibility. (Exhibit 3). This one was also dismissed in a clear case of a vulgar cover-up and an open invitation for the Plaintiffs to be tempted to try to take "Justice" in our own hands through non-violent or violent means.

As any objective mind can conclude, all the above strongly reiterated claims, supported with the hard, overwhelming, more than clear and convincing but beyond doubt evidence included since the outset of the administrative proceedings, complemented in these and related proceedings, and supplemented here, demonstrate *ad nauseam*, that the instant case is a shameful one not only for the Defendants and their lawyers but unfortunately for the courts that have intervened so far. It is a case, where the presumption of righteousness of the Defendant officers, with which there is admittedly nothing wrong per se, except for the lack of opportunity to rebut it, have provoked an inherently wrong pervasive bias and prejudice, that together with the lack of

provision for the slightest modicum of discovery, the opportunity to confront witnesses *de minimis*, much less an opportunity for at least a hearing, even less for a fair full-fledge trial, in brief, basic due process, has resulted in a forensic fiasco altogether. All this has been unjustly capitalized by all the intervening officers who have made the best of their ill-desires and hidden agendas, because among other reasons they have been facing a litigant that has heretofore been confronting them mostly alone and without resources. This has facilitated the government lawyers their vicious destruction of the Plaintiffs who heretofore have had to face for over ten (10) years, all their extrinsic and intrinsic frauds, without being given at least the benefit of the doubt by any of the intervening courts actors that are supposed to be objective evaluators of the issues at stake in the instant case. This has inadvertently given a booster to their cheat.

Of all of the above serious violations by the denounced federal officers, most particularly the lawyers involved, it is difficult to determine which was worse than the other or on which one was committed with more bad faith. If we were to choose, we would elect the occlusion of the USDE-OIG-QATR to the Plaintiffs and all the courts as the quintessential be-all and end-all, simply because it represents a report by the own agency experts that besides rejecting and chastising the "findings' by the OIG-AIC Nater, it provided the government lawyers with more than enough reasons not to proceed with their evident malicious prosecution and assassination of the Plaintiffs. In this vein, the following applicable and controlling precedent should respectfully be taken into consideration by the HC evaluating this Motion. From Hull v Municipality of San Juan, cited supra, we respectfully quote.

> [28] We find no clear error in the district court's finding that Andrew's fraud was proved by clear and convincing evidence. It is easy enough to forget details of one's past; and possibly Andrew did suffer some impairment in the fall affecting his memory. But the

information withheld was too patent and too convenient, and the pattern of deceit and grudging concessions too marked, to excuse the misstatements and omissions as merely careless.

[29] The next question is whether a district court has power to dismiss a complaint because the plaintiff lies substantially and materially in the course of discovery. In our own circuit, fraud--at least of a kind sometimes called "fraud on the court" *fn2 --is a potential basis for dismissing a claim on the facts where

[30] a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

[31] Aoude, 892 F.2d at 1118-19. There is similar case law in other circuits. Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1476-78 (D.C. Cir. 1995); Wyle v. R.J. Reynolds Indus., 709 F.2d 585, 589 (9th Cir. 1983).

[32] Although not so terrible as attempted bribery of a judge, Andrew's conduct fits within the Aoude category. It was deliberate, broad enough to constitute a scheme, unconscionable, and calculated to enhance damages, thus unfairly hampering the defense. The unfairness was two-fold: the scope of the injuries attributable to Andrew's fall in Puerto Rico was likely to be the main issue in the case, and, in the nature of things, past medical information is peculiarly within the privileged control of the plaintiff. The same conduct might not necessarily be enough to reopen a final judgment after one year, Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 47-49 (1st Cir. 1995), but finality of long-standing judgments is a different matter than dismissal of a current complaint.

[33] That a remedy is in principle available does not mean that its use is reasonable in all circumstances. Here, plaintiffs make both a substantive and a procedural objection. The first is that it was unreasonable to use so extreme a remedy as dismissal, especially where the defense ultimately gained the information and lesser remedies were available. The second is that the district court erred by not specifically considering the pros and cons of alternative lesser remedies. Both are uphill arguments, given the trial judge's special competence in judging the extent of the misbehavior and its effects. Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003).

[34] Starting with substance, the sanction was obviously severe and lesser sanctions were available. For example, the court could have debarred Andrew from presenting certain claims of injury, underscored the jury's ability to draw negative inferences from his deceits, or both. And while the deceits imposed extra expenses on the defense, an award of attorney's fees and costs could have been treated as sufficiently offsetting this damage.

[35] On the other hand, dismissing only the affected claims of injury would have wiped

out most of the main damage claims anyway, while inference drawing would be available without a sanction and could be pretty mild in effect if Andrew were nimble on cross-examination. His deceits were substantial, deliberate, and went to the heart of the case. And since not everyone will be caught, the penalty needs to be severe enough to deter. In the choice of remedy, there was no abuse of discretion--the proper test as to remedy. Aoude, 892 F.2d at 1117; Fernandez v. Leonard, 963 F.2d 459, 462 (1st Cir. 1992).

[36] As for procedure, plaintiffs draw our attention to cases in other circuits saying that the trial judge must expressly consider lesser alternatives before adopting the extreme remedy of dismissal; and they urge us to adopt such a rule. Shepherd, 62 F.3d at 1479; Halaco Eng'g Co. v. Costle, 843 F.2d 376, 381-82 (9th Cir. 1988). We agree that lesser remedies ought to be considered, where reasonably available, whenever a judge imposes the harshest sanction. But in our view, how much consideration, and in what form depend upon the circumstances.

[37] In this instance, the district judge did not grasp thoughtlessly for dismissal. The choice of remedy followed a careful study over many pages of the precise deceits and Andrew's culpability; the court recognized that it had discretion as to remedy; and it said that dismissal was "commensurate" with Andrew's conduct and the need to deter "this type of behavior from recurring"--behavior that the court said went well beyond injury to an opposing litigant and threatened "the integrity of this court."

[38] Requiring a district judge to list and address alternatives may sometimes make sense, for example where the judge has ignored a seemingly superior remedy. Occasionally it may be a polite way to say that the remedy chosen is disproportionate to the offense--also not the case here. How much explanation is required of the remedy chosen, and how much discounting of alternatives may be warranted, depend on the facts, and to us a mindlessly mechanical rule makes no sense. Here, the district court did enough to assure reasoned consideration of the remedy.

Finally, in support of our prayer that in view of the evidently and obviously contumacious and egregious conduct of the Defendants here, this HC, not only grants this Motion but grants default judgment or in the alternative summary judgment for the Plaintiffs, we include the following applicable and controlling precedent in support. From Dixon v. Commissioner of Internal Revenue Service, No.00-70858 (9[th.Cir]. 1/17/2003), we respectfully quote:

[40] [1] Courts possess the inherent power to vacate or amend a judgment obtained by fraud on the court, Toscano v. CIR, 441 F.2d 930, 933 (9th Cir. 1971), but that power is narrowly construed, applying only to fraud that defiles the court or is perpetrated by

officers of the court. When we conclude that the integrity of the judicial process has been harmed, however, and the fraud rises to the level of "an unconscionable plan or scheme which is designed to improperly influence the court in its decisions," we not only can act, we should. England, 281 F.2d at 309; Levander v. Prober, 180 F.3d 1114, 1119 (9th Cir. 1999); Intermagnetics Am., Inc. v. China Int'l Trust and Inv. Corp., 926 F.2d 912, 916-17 (9th Cir. 1991).

[42] [3] Prejudice is not an element of fraud on the court. HazelAtlas, 322 U.S. at 238; Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1132-33 (9th Cir. 1995). *fn9

Fraud on the court occurs when the misconduct harms the integrity of the judicial process, regardless of whether the opposing party is prejudiced. Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989). Furthermore, the perpetrator of the fraud should not be allowed to dispute the effectiveness of the fraud after the fact. Hazel Atlas, 322 U.S. at 247; Pumphrey, 62 F.3d at 1133. Because the Tax Court applied the wrong legal standard, it abused its discretion. See Paulson v. City of San Diego, 294 F.3d 1124, 1128 (9th Cir. 2002) (en banc).

[43] [4] As the Supreme Court observed more than fifty years ago, "[t]ruth needs no disguise." Hazel-Atlas, 322 U.S. at 247. There can be no question here but that the actions of McWade and Sims amounted to a fraud on both the taxpayers and the Tax Court. The Tax Court believed it was hearing a legitimate adversarial dispute when, in fact, the proceeding was a charade fraught with concealed motives, hidden payments, and false testimony. What did occur was clearly designed to defile the court itself, and there is no question that it was carried out by an officer of the court. Toscano, 441 F.2d at 933. Such fraud corrupts the adversarial nature of the proceeding, the integrity of witnesses, and the ability of the trial court to judge impartially. See England, 281 F.2d 304. This harm is noteworthy not only because it defiled the sanctity of the court and the confidence of all future litigants, but also because it violated the rights of the test case petitioners and the more than 1,300 taxpayers who agreed to be bound by the outcome of the Tax Court proceeding. See Levander, 180 F.3d at 1118 ("[T]ampering with the administration of justice in this manner involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public."). As such, the taxpayers have clearly and convincingly demonstrated fraud on the court and are entitled to relief.

Even when "prejudice is not an element of fraud on the court" we cannot end without

emphasizing that in the instant case more than 5,000 students lost their investments in their

future to ironically become less dependent of the U.S. of A. fisc; 500 employees lost their hard

earned jobs, and ARR lost everything except his resolve to unmask this mockery, due to the

infamy that we have summarized above, when all of them trusted the full faith and credit of the

otherwise Great U.S. of A., through the USDE, which had recognized the accreditation of IEU and had granted the Plaintiffs', the eligibility to administer these student financial aid funds.[35]

For all the above stated reasons, and reasons of "Equity and Justice", and in the alternative for reasons of the "appearance of "Justice", we respectfully, believe it or not, pray that the HC, reconsiders its posit against the Plaintiffs and grants this humble Motion for a new trial and its contained prayers. The Truth Will Out.[36] So we state, allege and pray.

Respectfully submitted, today July 29 2005.

Angel Ruiz Rivera
Pro Se and IFP
P.O. Box 191209, San Juan, P.R. 00919-1209.
787-714-1069; 787-435-3512

**Certificate of Service**

I, Co-Plaintiff Angel Ruiz Rivera, appearing Pro Se and IFP, hereby certify that a copy of this petition was served through mail to the appearing counsel for the Defendant, Isabel Munoz Acosta, Esq., U.S. Attorney's Office for the District of Puerto Rico, Civil Division, Plaza Chardon Suite 1201, 350 Chardon Ave. Hato Rey, P.R. 00918 and personally to the appearing counsel for Co-Plaintiff, IEU, Mr. Julio Morillo Limardo.

---

[35] By analogy, the last *ultra vires* similarly wrongful, negligent and illegal action by federal officers in another agency provoked more than $32 billion dollars in redress to the savings and loans banks destroyed or affected by them. See the so-called Winstar cases. Some have labeled the reasons behind these actions as the result of overzealousness. I personally believe that such quality is a mere pretext and is more often than not confused with overambitiousness which is the real reason behind all this. The reality is that some individuals are willing and able to do anything to escalate a step or two in the GS civil servant ladder and earn a couple of thousands of dollars more, or so, a year. If you, me, or whomever, happens to be on their way, they could not careless more. Their incontinent egos and overdose of some or all the seven capital sins altogether are their only reason for being.

[36] "The thyng that good is (as trouth and iustice) thoughe it be suppressed and kept and under for a time, yet it is not quenched utterly, but at length **wyll breake out agayne.**" Richard Taverner in Publius (1539). "Nay, indeed, if you had your eyes, you might fail of the knowing of me: it is a wise Father that owns his won child. Well, old man, I will tell you news of your son: give me your blessing; truth will come to light; murder cannot be hid along: a man's son may; but at the length, **truth will out.**" Lancelot, in The Merchant Of Venice, William Shakespeare 1596.