## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Instituto de Educacion Universal, Et Al.
Plaintiffs

v.                                          98-2225 (RLA)

U.S. Department Of Education,
Richard Riley, Secretary
Defendants

---

### MOTION FOR RELIEF FROM JUDGMENT

To the Honorable Court:

Comes now the Co-Plaintiff, Instituto de Educacion Universal (IEU) appearing through the undersigned counsel, and respectfully, STATES, ALLEGES and PRAYS as follows:

This Motion is filed pursuant to Federal Rule of Civil Procedure (FRCP) 60 (b) (1)(3)(6). "Mistakes; Inadvertence; Excusable Neglect; Fraud, Misrepresentation, etc." The following applicable and controlling jurisprudence is cited in support. Hazel Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238 (1944); Aoude v. Mobil Corp., 802 F.2d 1115 (1st.Cir. 1989); Pearson v. First NH Mortgage Corporation, 200 F. 3d 30 (1st.Cir.1999); and Hull v. Municipality of San Juan, 356 F.3d 98 (1st.Cir. 2004).

### Introduction

This motion seeks to reverse an Order and Final Judgment by this Court entered on October 26, 2005, dockets # 69 and 70. The facts of this case originated when some of the intervening federal officers, concocted a flagrant malicious prosecution against the plaintiffs, in clear violation of their civil and constitutional rights. The clear and convincing evidence included

1

herein, prove that these officers' actions were motivated by personal agendas, prejudices and invidious discrimination.

As the Court will corroborate, in order to accomplish their ends, these federal officers, particularly the intervening attorneys, have consistently abused the legal process as their main strategy. This abuse has been perpetrated with an arsenal of tactics that have included but not been limited to: fabricating and manipulating evidence, suborning perjury, intimidating witnesses and obstructing justice. In the process, they have committed misrepresentation and/or fraud to all those which have evaluated the legal claims and issues at stake in this controversy. Starting with those at the administrative level, including U.S. Department of Education (USDE) Administrative Law Judge (ALJ), continuing with the very Secretary of the U.S. Department of Education. This is a classical case of malicious prosecution. Upon a careful evaluation of this motion, the court will be in a position to verify that regardless of whether the denounced sham was orchestrated in a form of a conspiracy or not, it was nevertheless induced into error by the wanton and egregious actions of the denounced USDE officers. For these reasons, this Motion should be granted.

**The USDE Agents of the Fraud**

The first group of USDE officers who committed misrepresentation and/or fraud upon the courts, were the Auditors- In-Charge (AIC) of the USDE audits, who manipulated data, issued the flawed findings, and at least once committed perjury to support the claims against (IEU) which originated the issues in this case. These auditors namely: Mr. Rafael Nater, a Certified Public Accountant (C.P.A.) and attorney, who was at the time of the events the AIC of the USDE's Office of the Inspector General (OIG); and Mr. Felix Lugo, the AIC of the Program

2

Review of the USDE's Institutional Review Branch (IRB), the auditing branch of the USDE.

These auditors committed fraud and misrepresentation upon the agency and the courts by first, imputing "findings", that they knew were patently false. Second, the misrepresentation and fraud were exacerbated when the findings were maintained and sustained, aided and abetted by the USDE attorneys, (Ms. Gil Montero and Mr. Wolff and their superiors), amidst IEU showing of clear and convincing evidence, that rebutted all of the auditors' findings. Thirdly, the misrepresentation and fraud became patent in the case of Lugo when he perjure himself by falsely declaring against the IEU, (See, Exhibit # 1), just as he did against another institution which he also viciously destroyed contemporaneously with his *ultra vires* acts. See, San Juan City College (SJCC) and Americo Reyes[1] v. United States, 03-5180, U.S. Court of Appeals for the Federal Circuit, (12/9/2004). (Exhibit # 2).

The misrepresentation and/or fraud was committed by Mr. Lugo, only to later quit the USDE as his employer and join the main competitor of both IEU and SJCC; namely: Instituto de Banca y Comercio (IBC). Once there, Lugo lend himself to act out as IBC's President when Mr. Fidel Alonso Vals was indicted with criminal charges by the U.S. Attorney in one of the sequels of the ex- Secretary of the Department of Education of P.R., Victor Fajardo's cases for corruption in the management of federal funds. (See indictment of Mr. Fidel Alonso Vals, the President - Founder of IBC, in case 3:02-cr-042(HL), Exhibit # 3). When this indictment transpired, the

---

[1] Notice that in that case, the SJCC's President standing as Co-Plaintiff has been honored by that District and Circuit, all throughout that process, contrary to what has been pretended to be done in this one. Incidentally, that Circuit Court described the actions originated by Lugo in this fashion: "Given the Kaka-esque nature of the bureaucratic bungling reflected on the record..." San Juan City College and Americo Reyes Morales, v. The United States, No.01-73C, 8/8/2003, in the U.S. Court of Federal Claims, p.8 of 11. Exhibit 2.

USDE officers denounced here, did not take any action against IBC, as mandated by law and its regulations, whenever the President of an institution falls under such a predicament. There were no switch to the reimbursement method of payment, no pre-confiscation of funds to be disbursed, no request for a guarantee in the form of a letter of credit, and much less an initiation of termination of eligibility action, as the USDE officers denounced herewith did with IEU, even when its officers were never indicted, which brings about a legitimate question of equal protection and treatment under the constitution.

The second group of federal officers who committed misrepresentation and/or fraud upon the courts were the  supervisors of the USDE attorneys; namely: Ms. Ellen Bass, Esq., the OIG Chief Legal Counsel and Ms. Jammienne Studley, Esq., the USDE's Office of the General Counsel (OGC) Chief Counsel.

**The Arguments and the Evidence of the Denounced Fraud**

In this case the misrepresentation and/or fraud upon the courts were repeatedly manifested in the following ways and manners.

First, the claims by the IEU in this case are related to the statutorily protected right under the Administrative Procedures Act, 5 U.S.C. sections 701-706, see, Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967) and Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, (1971) to request judicial review of the three audits "findings" imputed by the AIC's, and retained by the USDE attorneys for the supposed mal-administration of the funds that the IEU had a fiduciary and contractual obligation to honor.  Most of the findings have heretofore been unjustly and inexplicably upheld by the intervening courts amidst the misrepresentation and/or fraud denounced and proven herein. These findings are: the"clock hour"; the "excess

4

cash" and the "unpaid refund" findings. The first two were the product of the fabricated and grossly inflated audit by OIG-AIC Nater and the latter one the product of the perjury of IRB-AIC Lugo.

The court should take notice of the fact that after their respective audits, Nater was expelled from the USDE-OIG and Lugo resigned from the USDE-IRB. IEU avers that this fact also raises very serious legitimate questions. In line with them, this Court should meditate upon the fact that if these AIC's, would have fully complied with their ministerial duties, as the agency's attorneys denounced have heretofore maintained, why was Nater expelled and Lugo resigned from the agency after their respective audits of IEU? Why was Nater not commended as a result of his job, as he claimed in his personal cases against the USDE, since as its result the USDE pre-confiscated from IEU more than $2.263 million based on his work product? Why did Lugo quit the USDE only to join IEU main competitor, IBC? These events were not the product of mere sheer coincidence.

As our second argument, we must refer this Court to the clock hour "finding", by Nater. The evidence emanating from the OIG Audit Draft Report and Audit Report, clearly demonstrates that IEU did not charge for non-instructional time, which is precisely the gist of the issue here. See, excerpt of the OIG Draft Report of July 1995 at p.4, Exhibit # 4. See, excerpt of the OIG Audit Report of September 1995 at p.5-6. Exhibit # 5. Both these audit reports equally spelled out that for its day and evening sessions, IEU:

" (1) Includes a 50 minute recess that IEU **did not consider as instructional time**."
" (2) Includes a 20 minute recess that IEU **did not consider as instructional time**."

These reports spelled out that "IEU did not consider as instructional time" its recesses or breaks,

therefore, there was no mal-administration. The above citations are pertinent and relevant because they demonstrate to this Court the fact that the claims made by the USDE related to this issue were frivolous and fraudulent, and escalated into a malicious prosecution. The mere arithmetical corroboration of the **net minutes of instruction** *vis a vis* the **gross minutes in the school day** (or night for that matter), necessarily entails that mathematically, scientifically, IEU not only **did not** overcharge anything but it implies that the way IEU was managing its schedule, there was simply **no** way it could had. (Emphasis added). The agency's attorneys have misrepresented facts since they wantonly occluded the above evidence from the courts which emanates from the own USDE's OIG audit reports that exonerate the IEU.

> IEU respectfully refers the transcript of the October 22, 1996, Administrative Hearing, at p. 177, from where we cite the following pertinent and relevant quote:
>
> Question by Mr. Cerezo: But you can guarantee that after auditing their representation of 50- minute classes is being confirmed, that that's the same thing that they are offering in their brochures, correct? **That they were not overcharging, they were not overcharging 60 minutes for 50 minutes.**
> **Answer by Mr. Rios: No, they're not charging 60 minutes.**
> **Q. That would be your testimony under oath.**
> **A. That's my testimony under oath**." (Emphasis added). See Exhibit # 6.

Incidentally, the testimony by OIG Chief Auditor's (Rios's), was timely objected and should not had been allowed since it is entirely pure hearsay, (see Federal Rules of Evidence 802, et seq.). Rios was not the AIC of the IEU's audit. The USDE attorneys misrepresented to IEU and the ALJ that Rios allegedly had personal knowledge of the audit performed by AIC Nater due to the former being the *de jure* supervisor of Rios. The truth of the matter is that Rios was produced instead of Nater simply because the latter was not available since he had been expelled from the USDE, in part for his flaws in the IEU's audit and in part for his history of insubordinations

6

against Rios. The USDE attorneys have heretofore hidden this issue of material fact from the

courts which constitute misrepresentation if not fraud, a fact which entitles the plaintiffs for relief

of the judgment under FRCP 60 (b).

Furthermore, in the USDE-OIG June 28, 1996 Final Audit Determination (FAD) at p.3,

Exhibit # 7, the defendants' conceded that:

> "During the period prior to the change in the definition of a clock hour (prior to the 1993-
> 94 award year) **there may have been ambiguity in the interpretation of the regulation
> regarding the definition of clock hour. Therefore, we are not assessing a liability for
> the years prior to the 1993-94 award year.**" (Emphasis added).

This concession of the FAD represented an admission that the imputation of the findings from

the start was vicious. As vicious as it was for the years prior to 1993-94, it has also remained for

the 1993-94 year, because of the USDE attorneys' misrepresentation and/or fraud.[2]

In view of the above, and left without any other alternative, the agency's attorneys have

conceded to the intervening courts in their writings, that the "clock hour regulation may have

been ambiguous", prior to the amendments to the Federal Register of July 1993 and the

purported clarification of the Secretary in its Preamble. But having admitted to this, have not

explained to the courts, why the USDE originally imputed this "finding" for the years 1991-1992,

---

[2] Eventually, the own OIG reduced this amount in its FAD from $3.8 million to $1.2 million by
eliminating the 1991-93 years. It is our contention that they should have eliminated it entirely and that is
one of the genuine issues of material fact in controversy that still have IEU attached here. The elimination
for only two of the three years in question after self-conceding that it was ambiguous constitutes, by and in
itself, a capricious, arbitrary and unlawful decision.

1992-1993, inflating the resulting liability and so informing it to the U.S. Congress.

The USDE have not explained why, even when it backpedaled at this juncture in terms of this issue, they misinformed -against the IEU and its founder Angel Ruiz Rivera- before the U.S. Congress by reporting that the plaintiffs had been "caught stealing" as a result of the flaw audits, where the agency jumped into conclusions without regard to the minimum due process guarantees since the "finding" were not yet final at the USDE. To this date the USDE officers involve have not corrected that unripe information, which at the present remains in the record and is contradicted by the evidence. (Exhibit # 24).

The above described actions constitute misrepresentation and/or fraud because all the legal opinions, audit memorandums and the case law at the agency, by its ALJ's, explicitly and specifically rejected the results. This exact issue had been treated before at the USDE since 1985, and in all instances, all authorities, had invariably and consistently decided it against the arbitrariness and caprices of the agents of the USDE who were *ultra vires* pushing this issue beyond the limits of what is reasonable and logic, much less legal. The USDE unsustainable position is reduced to an unprecedented illegal attempt to micromanage the IEU's breaks or recesses, just as the USDE-ALJ denounced in its Decision in In The Matter of Instituto de Educacion Universal , Docket No. 96-28 ST; 96-93-SP; 96-103-SA. See Decision at 4, Exhibit # 8, which reads in part:

> "If the non-inclusion of non-instructional time in the clock hour computation is based on this theory, **then this appears to be a venture of the Department to exercise direction or control over IEU's curriculum or program of instruction, which is expressly prohibited. 20 U.S.C. 3403.; see also 20 U.S.C. 1232-a, 5899. The arrangement of instructional and non-instructional clock hours is not a Departmental concern**, but one within the province of a state licensing body or accrediting agency....
> **If this is SFAP's position, it is based on an ambiguous change to the regulation**

8

**which leaves the regulation to further contention. Although the secretary indicates that a clock hour of instruction should occur in a "discrete 60-minute period", the regulation is not quite so precise. Requiring that the non-instructional time immediately follow a distinct 50-minute period of class ignores the dynamics of classroom behavior involving classes of two or more consecutive hours in length…"** (Emphasis added).

The untenable position narrows down to misrepresentation to the courts because IEU aggregated the breaks or recesses between classes into one, that should be equated to it having been overcharging the USDE for non-instructional time. The USDE originally admitted and conceded that IEU did not consider as such. Hence, these misrepresentations and/or fraud upon the courts in regards to this issue are reasons why this FRCP 60(b) motion should be granted.

**In terms of the "Clock Hour Finding Issue"**

1. The USDE-OGC legal opinion by Mr. Fred Marinucci, Esq., entitled "Note to Clifton Knight, IRB: Re: Measurement of non-standard class sessions in clock hours". (Per Knight's request as the USDE's Chief Auditor of the IRB), which emphasized that:

" To uphold the interpretation of the regulation advanced in the Dear Colleague and the Q & A, the regulation must be ambiguous enough to leave room for interpretation, and the interpretation must be consistent with the terms of the regulation and the reasons the rule was adopted. **Because the regulatory language "equivalent of a 50 to 60 minute period" is not ambiguous on its face, and because the rule was promulgated with the avowed intention to preserve institutional flexibility, it seems more probable that a reviewing administrative tribunal or court would reject the Dear Colleague restriction applied** to the 100-minute class considered by the program reviewer here". (Emphasis added). See, Exhibit # 9,

2. The IRB's Chief Auditor Knight's Memorandum of the Division of Audit and Program Review, echoing the above legal opinion, admonishing the auditors for the treatment they had been theretofore giving to the issue, and **establishing the following as policy:**

"Purpose: To clarify the definition of a clock hour in Section 668.1 of the General Provisions regulations and provide guidance to reviewers in determining a school's clock

hour compliance.

"...The regulatory definition, as defined in the law, states that a clock hour is the equivalent of a 50 to 60 minute class, lecture or recitation. **The law does not stipulate that a break of any given length must be given in a 60-minute period.**(bold ours) **Because the Department's concept of a clock hour included provisions not specified in the regulatory definition, we requested an opinion from the Office of the General Counsel (OGC).** We asked OGC to determine whether or not the Department's interpretation of a clock hour would withstand a legal challenge.

OGC's Response

**OGC's response concludes that the regulatory definition of a clock hour "equivalent of a 50 to 60 minute period" is clear and does not require the Department's interpretation. Furthermore, the regulation was written with the intention of preserving institutional flexibility. Therefore, it would seem more probable that a court would reject the Department's interpretation.**

**DAPR Policy:**

IRB's guidance for required action for program review findings of this nature is as follows:

Example 1: When a program reveals that an institution taught two 50-minute classes in succession without a break, e.g. 8:00- 8:50 and 8:50 - 9:40, (Just as in IEU's case, our parenthesis) **the reviewer should not cite a finding or take any action....**"

(Emphasis added). (See Exhibit # 10).

3. There is a third reason why the denounced USDE attorneys, knew that the clock hour finding against IEU was frivolous and fraudulent and that was the knowledge of the ALJ decision in the case In The Matter Of Denver Paralegal Institute, 92-86-SP and 92-87-SA

The ALJ decision held at p. 16 that:

" **Initially, a clock hour is defined by 34 C.F.R. section 668.12 (1989) as "the equivalent of a 50 to 60 minute class, lecture, or recitation." Thus, 50 minutes of instruction is sufficient to constitute one clock hour. Hence, the regulation is clear that clock hour measurement does not correspond precisely with the actual amount of time of instruction. Clock hour measurement will always be the same or more than the actual instruction time. Hence, ED's premise underlying its litigating position– that clock hour measurement reflects actual time– is inconsistent with the Department's regulation.**

…

The clock hour regulation focuses solely on the period of instruction. Break periods are not relevant under the regulation. **Thus, the determining factor is the quantity of the education provided, not whether there is or is not a break provided before or after the period of instruction.** In this case, the minimum quantity of education provided at

DPI satisfies the quantity required by ED's regulations." (Emphasis added). (<u>Exhibit #
11</u>).

That decision was issued on March 14, 1994 and affirmed by the USDE Secretary on February
24, 1995, it established the agency's precedent. In other words, **it was issued two and a half
months before IEU's OIG audit commenced and it was reaffirmed four months before the
IEU's OIG audit Draft Report was issued** (July 1995). (Emphasis added).

4. The USDE attorneys knew about the decision of the ALJ in the <u>case In The Matter Of
MBTI</u> (93-147-SA), decided on April 15, 1994, just five (5) weeks after the DPI case, and still a
month and a half **before the start of IEU's OIG audit**. It was affirmed by the Secretary on July
9, 1995, merely four months after the DPI case and more than two months **before the OIG
issued its IEU's Audit Report and more than eleven months before OIG issued its Final
Audit Determination (FAD)**. (Emphasis added). (<u>Exhibit # 12</u>)

In the case, the USDE lost the frivolous raising of this issue. The above decision
constitutes beyond doubt evidence that Ms. Gil-Montero, Mr. Wolff and their confederates acted
in patent disregard of the law, the regulations, the legal opinions, the audit policy memos and the
ALJ's decisions, affirmed by the USDE Secretary, the ultimate authority therein. The
misrepresentation and/or fraud by the USDE's staff lies in wantonly and egregiously occluding
the above mentioned case law from the IEU and the courts, which was clearly and indisputably
applicable and controlling.

Furthermore, in the MBTI's case, supra, the USDE re-litigated the same litany of
rehashed frivolous arguments. The ALJ had no other choice but to accentuate it for the record.

**"The positions and arguments of the parties in this litigation are identical to the
dispute in In re Denver Paralegal Institute, (citations). There, ED's argument was**

11

**rejected and the tribunal held that the clock hour regulation focuses solely on instructional time and that a clock hour may less than an actual hour of time–......  For the reasons ..., the position set forth in the Dear Colleague Letter is rejected"**

Nonetheless, the USDE had included in this MBTI's case, an amendment to the Denver case

argument and unsuccessfully tried to persuade the tribunal.

    This is what the ALJ had to say regarding this "new" argument, exactly the same one the

USDE reiterated against IEU later on.

> **"ED also relies on the Preamble to the Federal Register published on July 23, 1993.**
> In the Preamble, the Secretary notes that an institution may not compute clock hours by
> dividing by 50 minutes–(quote of the preamble)
> Regulations and decisions of the Secretary, issued in response to appeals of the decisions
> of Administrative Law Judges or hearing officials, are binding on this tribunal as
> accepted means of expressing policy and interpretation. **However, a comment by the
> Secretary in a Preamble is not a regulation and has no binding effect.** See Bissette v.
> Colonial Mortgage Corp. of D.C., 477 F.2D 1245,1247 (D.C. Cir. 1973); Gersman v.
> Group Health Ass'n., Inc., 725 F. Supp 573,577 (D.D.C. 1989); Council Of Hawaii
> Hotels v. Agsalud, 594 F. Supp. 449,453 (D. Haw. 1984). "[T]he Preamble …is merely a
> general statement of policy which does not mitigate and certainly does not override the
> specific requirements laid out in the body of the statute." Samuels v. District Of
> Columbia, 650 F. Supp. 482, 484 (D.D.C. 1986)." (Emphasis added).

The above necessarily means that the USDE attorneys could not possibly sustain this issue

legally. First, in view of their own OGC legal opinion; Second, in view of their own Chief

Auditor's Policy Memo; Third, in view of their own ALJ decision in Denver. Fourth, in view of

their own ALJ decision in MBTI, where the same "new" arguments that was raised against IEU,

regarding the amendment to the July 1993 regulations and the purported clarification in the

Preamble, were both rejected by the USDE ALJ, and affirmed by the USDE Secretary.

    Of the myriads of the evident misrepresentations and/or frauds to IEU and the courts by

the USDE attorneys herein corroborated one of the most salient is that they have induced the

courts into error by making the fraudulent misrepresentation in a reiterated fashion, that allegedly

the MBTI case law precedent by the ALJ, should not be taken into account, because it supposedly

addressed the issue before the July 1993 regulations came into effect. See, SFAP's December 20,

1996 Post Hearing Brief at p. 16, ¶3. "However, these cases interpret the definition of a clock

hour before regulatory change..." (Underlined in the original). Exhibit # 13. This fraudulent

misrepresentation to the ALJ was consistently repeated to this Court by the USDE attorneys in

their motions in this case. See, Exhibit # 14.

As the above citation corroborates, the ALJ, in the MBTI case not only took into

consideration the USDE's defeated temerarious and contumacious arguments, but it went further

and defeated them again after having considered not only the amendments to the regulations of

July 1993, but also the purported "clarifications" of the Secretary to those regulations in the

Preamble of the corresponding Federal Register as published by the USDE. This irrefutably and

clearly constitutes another instance where the USDE attorneys committed misrepresentation

and/or fraud over the issue. See, NLRB v. International Union Of Operating Engineers, Local

925, 460 F 2D 589, 604 (5th. Cir. 1972), for the following excerpt of perfect application to the

instant case:

> **"The law that governs an agency's significant departure from its own prior
> precedent is clear. The agency cannot do so without explicitly recognizing that is
> doing so and explaining why.** As Professor Davis has pointed out, **"The dominant law
> clearly is that an agency must either follow its own precedents or explain why it
> departs from them."** 2 K. Davis, Administrative Law Treatise Sec. 8:9 At 198 (1979).
> **The agency has a duty to explain its departure from its prior norms.** The agency may
> flatly repudiate those norms, deciding, for example, that changed circumstances mean that
> they are no longer required to effectuate Congressional policy. Or it may narrow the zone
> in which some rule will be applied, because it appears that a more discriminating
> invocation of the rule will best serve educational policy. Or it may find that, although the
> rule in general serves useful purposes, peculiarities of the case before it suggests that the

rule not be applied in that case. **Whatever the ground for departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate . . .**

If the agency distinguishes earlier cases, it must assert distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing. **Atchinson, Topeka & Santa Fe Railway Co. v. Wichita Board Of Trade, 412 U.S. 800, 808,809.**

**... There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case . . . An inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated."** (Emphasis added).

"Since attorneys are offices of the court, their conduct, if dishonest, would constitute fraud on the court.", Kupferman v. Consol. Research & Mfg. Corp., 459 F. 2d 1072, 1079 (2d.Cir. 1972) ( an attorney might commit fraud upon the court by instituting an action "to which he knew there was a complete defense"). Alexander v. Robertson, 882 F. 2d 421 (9[th.Cir]. 3/16/1989).

As an additional important note, this capricious and vicious "clock hour finding", with all the previous strikes it had against it, clearly cannot be applicable to IEU because by the time the USDE' amended regulations became effective, [forty five (45) days after July 23, 1993, that is, September 7, 1993], the award and academic years, were well under way (July 1). This obligatorily entails that the USDE's attorneys' application of their subjective interpretation, (since-1985-always-rejected-by-all-of-its-own-authorities), should not apply to IEU. Only if a federal court of law, under these circumstances, finds just, reasonable and logical that it should apply them *nunc pro tunc*, this scenario could be possible.

See, from Manhattan General v. Commissioner, 297 US 129.

"The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into

14

effect the will of Congress as expressed by the statute. **A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.** Lynch v. Tilden Produce Co., 265 U.S. 315 , 320-322, 44 S.Ct. 488; Miller v. United States, 294 U.S. 435, 439 , 440 S., 55 S.Ct. 440, and cases cited. **And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable.** [297 U.S. 129, 135]   International R. Co. v. Davidson, 257 U.S. 506, 514 , 42 S.Ct. 179, 66 L.Ed . 41. **The original regulation as applied to a situation like that under review is both inconsistent with the statute and unreasonable.**

**The contention that the new regulation is retroactive is without merit.** Since the original regulation could not be applied, the amended regulation in effect became the primary and controlling rule in respect of the situation presented. It pointed the way, for the first time, for correctly applying the antecedent statute to a situation which arose under the statute. …. **The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute. It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand."** (Emphasis added).

For the above stated reasons, this Honorable Court should grant the instant motion and enter and Order of Relief from its previous judgment entered on October 26, 2004.

5. IEU cannot underemphasize that after they filed their original case related to this set of facts, Nater, was summarily expelled from the agency. It is also a fact that Nater sued the USDE at the USMSPB.3 IEU requested the record of that case to the USDE's attorneys since we had learned that Nater's flaws in the IEU audit had been one of the reasons why he had been expelled. The USDE attorneys replied that "if it exists" they would not give it to us, in still another undisguised attempt to obstruct justice. The USDE attorneys occluded this genuine issue of material fact to the intervening courts in patent misrepresentation and/or fraud. This is a

---

3  See USDE-OIG-AIC Nater's related cases against his former employer, the USDE, all of which were denied. At the U.S. Merit System Protection Board (HUSMSPB), NY.████████4-W-1 and N████████V-1. At the U.S. Court of Appeals for the Federal Circuit (HUSCAFC), [(99-3083), (99-3143), (99-3213)], all denied and affirmed in 232 F.3d 916 (Fed. Cir.5/9/2000). At the U.S. District Court for the District of P.R.(USDCDPR), 99-1366 (JP), denied and affirmed at the U.S. Court of Appeals for the First Circuit, 00-2348 (1$^{st.cir.}$ 7/23/2001).

scenario that makes this case suitable for default judgment against the Defendants for their

flagrant discovery violations under FRCP 37, or in the alternative for severe sanctions. See

United States v. Kahaluu Construction Co., 857 F. 2d 600 (9[th.cir]. 9/15/1988); Wanderer v.

Johnston, 910 F. 2d 652 (9[th.Cir]. 4/18/1990); Adriana International v. Lewis & Co., 913 F.2d

(9[th.Cir]. 9/10/1990), and Dixon v. Commissioner of Internal Revenue Service, No.00-70858

(9[th.Cir]. 1/17/2003).

In any event, IEU was able to get a copy directly from the USMSPB. From that record

IEU was able to acquire knowledge of the following pertinent and relevant facts which it submits

in the instant motion:

"1. That the OIG had a "Team" of experts within the agency that issued a Quality
Assurance Review (QAR) Team Report (TR) of Nater's audit. In other words, that the
experts within the expert agency, had performed an audit of the audit. (Exhibit # 15).
2. That in that report the "Team" not only criticized but chastised the only two findings
that Nater raised against the plaintiffs. Although the record is many hundred pages long
and in another instance of obstruction of justice the QARTR has consistently been denied
to us by the USDE, (Even through the Freedom of Information Act-FOIA provisions, see
case 04-0610 at the U.S. District Court for the D.C. District), we found the following:
Specific Observations:

1. Based on B-CT-3-a and B-CT-3-b, the school's calculation of clock hours may have
been correct, at least prior to the 1993/94 program year. The day students went from 8:00-
1:50 (translates to six hours) and the night students went from 6:00 to 10:40 (translates to
five hours). Using 50 minutes of instruction in a 60-minute period as the basis, the OIG
took the position that day students went for five hours and the night students went for
four hours, 10 minutes. **This position could be unsupportable under appeal because it
would discriminate against students based on the schedule as shown below:**

"-If the school schedule is - 8:00-8:50, 9:00-9:50, 10:00-10:50, 11:00-11:50, 12:00-12:50,
AND 1:00-1:50–a student attends for 300 minutes of instruction and has 50 minutes of
breaks. ED would argue that the student would be credited with six clock hours of
instruction. **Therefore, why should ED take the position that a student who attends
from 8:00-11:20 and 12:10-1:50, thereby receiving 300 minutes of instruction and
having 50 minutes of breaks, should be credited with only five hours of instruction?**

**An ALJ could have serious problems with this concept."** (Emphasis added). Exhibit #
15.

The question that follows is: Why did the USDE attorneys occluded this report from all

the competent authorities, starting with the ALJ, continuing with the USDE Secretary and ending

with this Court?  The QARTR was undoubtedly issued **before** the final agency decision, but it

could not be scrutinized neither by the ALJ nor the Secretary for the same reason this Court

could not: the clear fraud upon IEU and the courts by the USDE attorneys, by occluding it in

clear obstruction of justice. (Emphasis added).

6. In any event, of the few QARTR excerpts that IEU was able to access through the

Nater's record proceedings at the USMSPB, IEU also found the following pertinent citation:

" **The Team indicated that sufficient, competent and relevant evidence in support of
finding #1 was not obtained. They commented that: ..."the work papers did not
provide sufficient evidence to convince a cold reviewer that the school (sic) violated
the spirit of the regulations.**" (See Exhibit # 16)

The expelled USDE-OIG-AIC, Nater, cited the above excerpt from the QARTR in his response

to the QA Team Findings (IEU ACN 02-40075), totally exonerating the imputed finding against

IEU. The above actions by the USDE are mutually exclusive. If Nater's imputations through his

"findings" against the plaintiffs were correct, why was he expelled? If they were wrong, why

have them been upheld?  If their own QARTR forewarned and forearmed the OGC attorneys

about the fact that Nater's audit could not pass their own ALJ muster, what explanation can be

given to the pressing of these fraudulent "findings", amidst all the evidence that contravened

such a malicious prosecution? In view of the above, it is clear that the USDE attorneys flouted

against their own audit experts of the QARTR and their own ALJ' decision, affirmed by the

USDE Secretary. In so doing, the USDE attorneys withheld the QARTR findings from their ALJ

and Secretary as they did to this Court. This action should not be allowed to stand with impunity

as it has. It constitutes enough bases for this Court to grant this Motion.

"Where the moving party has been prevented from presenting the merits of his case by

the conduct of which he complains, Rule 60 (b) relief is most appropriate." Clarke v. Buckle, 570

F.2d 824 (8th.Cir. 1978); Patapoff v. Vollstedt's Inc., 267 F. 2d 863 (9th.Cir.1959). "For the

purpose of doing substantial justice, Rule 60 (b) motions must be liberally construed." See,

United States v. Gould, 301 F.2d 353,357 (5th.cir.1962), (quoting Ervin v. Wilkinson, 701 F. 2d

59 (7th.Cir. 1/13/1983), pages 2-3 of 4, ¶ 19).

7. Amidst all the above corroborated tactics and ill-efforts by the USDE attorneys, the

ALJ evaluating this matter, also decided this issue in favor of IEU. See, In The Matter of IEU,

(cited supra), where it decided against the USDE regarding this issue:

> " IEU justifies its method of determining clock hours by explaining that since its day
> students receive 300 minutes of instruction a day, and the increments of instruction
> are divided into 50-minute periods, it is only natural to divide the total number of
> minutes of instruction by 50 to arrive at the proper number of clock hours. It is
> adamant about not including non-instructional time in the clock-hour computation
> because to do so would result in a higher fee for its students...
>
> SFAP's failure to include the 50 minutes of non-instructional time IEU allows each
> of its day program students, and the 20 minutes of non-instructional time for the
> night students, in the computation of the program's clock hour suggests that the
> Department is interested in preventing a school from providing a continuous stream
> of lectures, without the benefit of a break. Perhaps this is premised on the concern for
> the value of such non-stop class time. .. If the non-inclusion of non-instructional time
> in the clock hour computation is based on this theory, then this appears to be a
> venture by the Department to exercise direction over IEU's curriculum or program
> of instruction, which is expressly prohibited. 20 U.S.C. Section 3403; See also 20
> U.S.C. sections 1232-A, 5899.
>
> The arrangement of instructional and non-instructional class hours is not a

**Departmental concern, but one within the province of a state licensing body or accrediting .**

Another theory which SFAP may be pursuing here is its interpretation that the clock hour definition in Section 600.2 requires the 50-60 minute class and any resulting 0-to 10-minute non-instructional time to occur within one consecutive 60 minute period, as opposed to being aggregated as discussed above. **If this is SFAP's position, it is based on an ambiguous change to the regulation which leaves the regulation subject to further contention. Although the secretary indicates a clock hour of instruction should occur in a "discrete 60 minute period", the regulation is quite not so precise. Requiring the non-instructional time immediately follow a distinct 50-minute period of class ignores the realities of the dynamics of classroom behavior involving classes of two or more consecutive hours in length.**

The problem faced with IEU would had been avoided (sic) if it had not aggregated the periods of non-instruction, but rather attached them to the end of each 50-minute segment of lecture. **However, I believe it retains its discretion, absent a contrary ruling by its accrediting agency or licensing body. Accordingly, I find that IEU has not overstated its clock hours to the extent advocated by SFAP because it should be permitted to use the combined total of its instructional and non-instructional time to arrive at the clock hour figure. .."** (Emphasis added).

As to why the USDE Secretary ended revoking his ALJ's in terms of this issue, and in so doing provoking a clear disparate treatment, since no other institution in the history of the USDE has been imputed these liabilities for this "finding" as IEU has, is one of the many reasons why there are genuine issues of material fact in this case. This should be obvious, if the Court takes into consideration, that the Secretary simultaneously revoked the ALJ decision in terms of the most significant issue at stake here: the termination of eligibility of the IEU. As a reminder, the Secretary while revoking his ALJ inexplicably and erroneously as to this clock hour "finding" issue, also incongruently and contradictorily ended revoking his ruling in terms of the eligibility issue determining that "termination is unwarranted or lack of intentional wrongdoing", in what amounted to a mere pyrrhic victory for IEU, (underlined for emphasis) See, Final Decision of the Secretary of October 28, 1997, "affirmed" on January 8, 1998, Exhibit # 17. IEU must denounce

19

the fact that the USDE's attorneys also committed misrepresentation and/or fraud to the ALJ and

this Court by deliberately omitting that at the time USDE's  Acting Compliance and Enforcement

Director (CED), Mr. David Morgan, in his unripe and improvident Letter of Termination of

Eligibility to IEU of March 12, 1996, (Exhibit # 18), (eventually revoked as we have just

presented), specifically stated that even under the revised regulations of July 1993 a clock hour

could continue to be a 50 minute period after all. The text of the Letter is definitely pertinent and

relevant to this motion.


" The revised regulations became effective on September 7, 1993.[4] Under the regulation,

the following are acceptable methods for institutions to structure periods of instruction:


**"(1) Instructions for 50 minutes** with no preceding or subsequent classes is acceptable
as one clock hour of instruction; instruction for 60 minutes with no preceding o subsequent
classes is also acceptable as one clock hour of instruction. (2)....... **(3) Instruction for 50
minutes** with no preceding class, followed by 10 minutes of non-instructional time with
subsequent classes 50 minutes in length, each followed by 10 minutes of non-instructional time,
is an acceptable schedule. Each 50-minute period would total a clock hour.

**(4) Instruction for 50 minutes** with no preceding class, but with a subsequent class of
instruction immediately following, is an acceptable schedule. However, 10 minutes of

---

[4] At p. 29 of the transcript of the administrative hearing of October 22, 1996 we find the following
confession by the USDE OGC'S attorney: **"As the tribunal knows, there may have been ambiguity in
the definition of a clock hour**. But effective September, 1993, any ambiguity that may have existed was
clarified. Since that time there can be no question that a clock hour equals 60 minutes. Accordingly, that is
the standard which IEU must comply. The problem with this statement is that this is not what we find in
the decision of the USDE own ALJ in in IN RE MBTI, affirmed by the Secretary. This constitutes beyond
doubt evidence that the OIG and the OGC attorneys confederated to violate the Constitutional, and Civil
Rights of the plaintiffs and their entire community, in open contempt and patent disregard of the own
USDE ALJ's decisions.

non-instructional time must follow the second class and all subsequent classes. In this instance, each 50-minute period would total a clock hour. This is acceptable because non-instructional time precedes the beginning of the first class. Thus, under the regulation, the first two periods of instruction may run consecutively."

Thus, is clear that a clock hour could be a fifty minute period. We respectfully invite this court to

revisit the applicable teachings in Connally v. General Construction, 269 U.S. 385, 391 (1926),

where the Supreme Court admonished:

> "....and a statute which either forbids or requires the doing of an act in terms **so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process law.** International Harvester Co. v. Kentucky, 234 U.S. 216, 221 , Collins v. Kentucky, 234 U.S. 634, 638 , . . . The precise point of differentiation in some instances is not easy of statement; but it will be enough for present purposes to say generally that the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough to enable those within their reach to correctly apply them, Hygrade Provision v. Sherman, 266 U.S. 497 (citations omitted).

IEU request the relief from judgment based on the above and following applicable criteria

expounded by the First Circuit in Aoude v. Mobil Corp., 802 F.2d 1115 ( 1st.Cir. 1989),

> [30] A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. (Citations).

> [31] .... The tactic plainly hindered defendant's ability to prepare and present its case, while simultaneously throwing a large monkey wrench into the judicial machinery. In our view, this gross misbehavior constituted fraud on the court. See Cleveland Demolition Co. v. Azcon Scrap Corp., 827 F.2d 984, 986 (4th Cir. 1987) (fraud on court may exist where witness and attorney conspire to present perjured testimony); Rozier v. Ford Motor

Co., 573 F.2d 1332, 1338 (5th Cir. 1978) (same, where party, with counsel's collusion, fabricates evidence).

[33] ... The courts' inherent power includes "the ability to do whatever is reasonably necessary to deter abuse of the judicial process." Eash v. Riggins Trucking Inc., 757 F.2d 557, 567 (3d Cir. 1985) (en banc); see also Brockton Savings Bank, 771 F.2d at 11....

[35] Tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

[36] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 88 L. Ed. 1250, 64 S. Ct. 997 (1944).[*fn2] All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process -- to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would, we think, foster the very impotency against which the Hazel-Atlas Court specifically warned.[37] **We find the caselaw fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court.** The Supreme Court said so in Hazel-Atlas, albeit in dicta. Id. at 250. The most closely analogous cases we can find, in our own circuit and in a variety of other courts, stand for much the same proposition.... (citations)

IEU respectfully paraphrases and adopt as ours the final words cited above: "In all of the above cases, the challenged conduct seems less reprehensible than in the case at bar." In view of the aforementioned, IEU respectfully pray for the granting of this motion based on the evidence presented herein.

**In terms of the "Excess Cash Finding Issue"**

22

The USDE officers, deliberately and blindly ignored the "excess cash" section in the Notes to The Financial Statements of the unqualified or "clean" opinions by the independent C.P.A. firms that performed IEU's external audits. Among them; KPMG Peat Marwick (KPMGPW) and the best reputed local firm for non-profit organizations; Valdes, Garcia & Marin (VGM). One of the basic reasons why there are genuine issues of material fact in controversy here is the fact that the external audits by true independent auditors, not only controvert and contradict but belie those of USDE-OIG-AIC Nater, who was dependent on the USDE, at least until he was expelled. Besides this fact, Nater was not only criticized but even chastised by the cited above QARTR of the USDE's experts within the agency paid to specifically detect and denounce the USDE's internal errors and crass negligence in audits such as this.

The misrepresentation and/or fraud upon the courts regarding this issue lies in the fact that the first agency attorneys who intervened obstructed justice in the nature of a conspiracy and their supervisors secondly neglected to prevent that conspiracy (see 42 U.S.C. 1986), by withholding from the courts that the QARTR, went as far as denouncing in writing in terms of this specific "finding" that: "...the logic is faulty" and is "not supported by the working papers". (See Exhibit # 15).

> "2.The audit work papers contain two different methods for calculating imputed interest. D-1 calculates interest on a daily basis, **but the logic is faulty**. D-1-1 calculates interest on a six-month basis **which cannot be justified**. The report says we calculated interest on a monthly basis. **This statement obviously is not supported by the work papers."** (Emphasis added).

The above assessment by the USDE experts in charge of evaluating this issue, perfectly coincide

with the plaintiffs arguments all through these proceedings. Expelled AIC Nater artificially and maliciously inflated this finding by using "posting dates" data to attempt to support it, [from a non-accounting, Management Information Systems (MIS) tool as his source], instead of the effective "credit dates", (from the true and valid accounting information systems tool he should had used; the accounts receivable ledgers). IEU will reduce the present argument to explain by analogy how and why the imputed "finding" is inherently flawed, dead wrong and consequently went awry before the eyes and minds of the objective USDE-OIG-QARTR expert evaluators.

Taking the "posting date" as the basis to calculate this "excess cash finding" instead of the effective "credit date", is equivalent to a court taking the "entry date" instead of the "filing date" of the motions in any given case as its basis to calculate the days that those motions were "filed late". As we know, the valid date is the date when the document is filed *de jure*, not when it is entered or posted in the docket *de facto*. By the same token, the valid date of a credit entry into an account receivable ledger is the effective date when the payment or credit is due and payable legally and not when it is posted. (It could be posted days or weeks after it was due). Thus, if the entry or posting date is taken to calculate the days cash was held in excess, the dispersion in the dates is obligatorily going to lead to an artificial inflation.

To make the wrongful treatment of this issue more pathetic, the following excerpt from our Statement of Contested Facts, illustrate how the imputed liability was grossly inflated amidst the fact that in the corresponding section of the written report by Nater, he conceded and recognized the accuracy of the plaintiffs' system of accounting for this particular concept.

"11. d. The USDE's also deliberately omits from its "Statement of Uncontested Facts", the uncontested fact that AIC Nater in the corresponding working papers related to this

24

issue, totally contradicted his finding when he wrote, in his own handwriting:

" Purpose: To test if students pmt.(payment) as per the Ledger Card (Tarjeta De Estudiante) are actually traceable to a Pell Disbursement List (Nomina y Posteo Pell) as indicated in the Ledger Card.

Source: Information provided by Jose Ruiz-Fiscal Officer for Inst. ED Universal-Student's Ledger Card, and Pell G.; SEOG Disbursement Lists prepared by IEU.

Scope: As part of our Cash Management review we asked Jose Ruiz the explanation for the method he use (sic) to request funds. As of Friday 26 of  August Jose explained to Porfirio Rios (ED-auditor AAS and myself (R. Nater-AIC) the following:

After the school enroll a student and the determination he will receive Pell is done, the school estimate the pmt. To be made to each student. Such estimate is base (sic) on the dates the student is expected to complete the require (sic) clock- hour for the pmt.

Also, Jose explained I.E.U. prepared a Ledger Card (Tarjeta De Estudiante) for each student; a pmt. List is also prepared for each student under each F.A. program. The actual pmt. Has effect at the date of the posting (List of credits to account which is known as "Registro de Posteo Electronico de Becas Pell"). This register (computer generated) is dated and signed by the IEU officer in the accting. Department authorized to do so. So the flow of the method is: the Financial Aid office prepare(sic) a list of program funds disbursement (which is prepared in accordance to the student enrollment status; the copy is forwarded to the accounting dept. which actually review the acct. and is who actually post the pmt. To the student account. The posting to the individual Ledger Card is done through the Computer. The date use(sic) is called the "Reference"(REF). That date actually refers to the date the posting register take effect as well as the date the posting to the "Ledger Card"is made. As to that we noted the Ledger Card include (sic) a date entitled 'Transaction Date" (Fecha Trans.). Jose Ruiz explained that the date the student was able to receive the program pmt. The base for that date is; for 1st. Pmt. IEU post the class start date; the other dates are based on the expected time the student would have completed the required clock-hrs for the pmt. As estimated. This best estimate is based on the length of the program and the daily class schedule of 6 clock-hr/day for day student (sic); 5 for night students)

According to the explanation we wanted to review if the transactions in the student's ledgers were actually accurate and traceable to the accounting records **To this end we traced 34 transactions which included tracing info from the student ledger-Pell + SEOG- to the accting records (Registro de Posteo). Also, we verified info. In the Pell G. Pmt. Summary.**

Test Results:

**Except for two exceptions, all the transactions were traced to the records and the information was accurate.** However, for one student (#17) we noted we were not able to trace a Pell recovery to the inst. Records, but we traced posting of the pmt. twice-nevertheless Pell Pmt. Sum accounted for only one pmt

Thus no effect on Fed funds. Other exception was noted (#(). For this student it appears I.E.U. could have made two pmts from Pell 91-92 but it actually made one pmt., nevertheless it informed and requested funds for two pmts from ED. The two pmts appear to be acceptable, however, since it was (sic) not made before the close of the A.Y. the payment ($1,200) should be refunded to ED and the auth. For that A.Y. (91-92) should be reduce(sic) for the same amt. No other exceptions were noted.

Conclusion: **Two isolated exceptions were noted.; the system of posting pmt in the "Registro de Posteo" and them posting it to the student acct card"provides accurate and traceable info.**

In accordance to our review a Pell pmt. for $1,200 should be refunded to ED. And the authorization reduced likewise.

**Thus, transactions related to the Fed program reflected (posted) in the student ledger card are traceable to the Disb'mt list and to the Posting List. "**

Signed Auditor AIC Rafael Nater - Sept. 01, 1994.

Supervisor Porfirio Rios Rojas - 1/13/95

Manager Thomas Whiting - 6/20/95

See OIG Working Papers Index D-6 Pages 1-5. (Emphasis added) (Exhibit # 19).

As to why the above written statement by Nater in his report found as part of his audit "work papers", totally contradict the contents of this IEU "finding", is an unanswered question by the expelled auditor, not produced witness at IUE's administrative hearings. As already known, IEU was never able to interrogate Nater simply because the USDE attorneys also occluded from IEU and from the ALJ that they had fired Nater. In lieu of Nater, they produced Rios, and misrepresented to the ALJ that Rios could speak for AIC Nater. In support of this motion, IEU present, for the Court's consideration, the First Circuit decision in Pearson:

"...On the contrary, whatever authority does exist suggests that once the record evidence demonstrates a "colorable" claim of fraud, the court may exercise its discretion to permit preliminary discovery and evidentiary proceedings. See, e.g., Hall v. Doering, 185 F.R.D. 639, 644 n.4 (D. Kan. 1999) (fraud on the court); cf. also, e.g., Rothenberg v. Kamen, 735 F.2d 753, 754 (2d Cir. 1984) (settlement procured by fraud).

[35] In fraud cases, the "colorable claim" standard is more appropriate than the "smoking gun" standard because **claimants who have been denied both preliminary discovery and an opportunity to present witnesses may well be left with no meaningful access**

> **to direct evidence of fraudulent intent**, notwithstanding an abundance of telltale circumstantial evidence. *fn2 In such circumstances, trial courts must be vested with adequate discretion to determine in the first instance whether the particular facts warrant discovery and post-discovery proceedings. <u>Pearson v. First NH Mortgage Corp.</u>, 200 F.3d 30 (1[st.Cir]. 12/29/1999), cited supra, ¶ 34,35. (Emphasis added).

Also, IEU must add that at the time of the facts that brought about this controversy, [more than eleven (11) years ago], the IEU's computer programs did not run "on line" and these issues of cash forecasting, request of funds, and their justification in audits simply did not evolve the way they do today. The U.S. Attorney, in the USDE's Motion for Summary Judgment of September 1996 in Case Num. 96-1893(JAF), p.9, described what were the then applicable accounting rules:

> " **Under the advance system, the Department provides funds to an institution before the institution pays student beneficiaries. In general, the Department provides these funds based simply upon an institution's request for them. An institution is <u>not</u> required to account to the Department fro these payments <u>before</u> receiving them. An after-the-fact-accounting is provided through a required annual audit. 34 C.F.R. section 668.23.**" (Underlined in the original). (<u>Exhibit # 21</u>).

As the Court can corroborate, this "excess cash finding" was so brutally inflated, that it ended not making any sense; accounting wise, financially wise, mathematically wise, and of course, legally wise. A perfunctory review of the "finding" will reveal that it was so grossly inflated that it became what the plaintiffs have elsewhere labeled as a "mathematical impossibility". Plaintiffs timely raised this point to the USDE officers, only to find their customary prepotent posture of irrationally taking for granted their auditor's position even when the agency ended expelling the auditor after the fact.  The imputation of the liabilities of this "finding" used as its basis an "average monthly excess cash" figure of $1.337 million. However, the average monthly cash figure of **all** funds received was about $786,000. This entails that as a result of the wrongful use of the "posting dates" instead of the "credit dates" by expelled USDE-OIG-AIC Nater, the result

was that the average monthly excess cash figure resulted into being almost double than the

average monthly cash received in totality (an improbability).

The following is an excerpt from the plaintiffs' Statement of Contested Facts which IEU

brings to the attention of the Court because of its pertinence and relevance to this motion.

> 11. "Contrary to the requirement that schools disburse funds within three-days of receipt
> discussed herein infra, the OIG found that **IEU requested and received federal funds in
> excess of disbursements by an average amount of $1,337,577 per month during the
> audited period**.(Citation)."(SOUF at 5).
>
> 11a. This is probably the clearest statement of the existence of a genuine issue of material
> fact in controversy in the instant case. As IEU has insisted throughout the history of the
> case, defendants' contention is impossible. IEU received a total of $28.3 million dollars
> in funds for the 36 months comprised in the audit which in turn represents an average of
> some $786,000 a month of total funds received ($28.3M /36). It is thus mathematically
> impossible that **IEU "requested and received federal funds in excess of
> disbursements by an average amount of $1,337,577 per month during the audited
> period"** (A.R. 570). Statement of Contested Facts, page 13,  Exhibit 21.

Mere elementary school division is all that is needed to corroborate this fact. For this reason, it

should not surprise anyone that the QARTR labeled this finding as one where the "logic is

faulty". But besides the obvious lack of mathematical sense, consequently, scientific soundness

of the "finding" itself, we must stress that the USDE attorneys responded to the plaintiffs' timely

and responsible denunciation of this accounting flaw with dishonesty. The USDE attorney in

charge of responding (Ms. Gil Montero) limited herself to argue that "... the average monthly

excess cash is not computed in the same manner as the monthly average of total funds." See,

Response Brief of the SFAP's of April 4, 1997, at p. 5, ¶ 1. Exhibit # 22.

The above argument exemplifies the character of the misrepresentation and/or fraud

upon the proceedings and the obstruction of justice in this case. It is also symptomatic of the

degree not only of the total disdain for the plaintiffs' constitutional due process rights guaranteed

by the Fifth Amendment. Mathematics is clear. And, as admonished by the U.S. Supreme Court, "a litigant who has engaged in misconduct is not entitled to 'the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.'" Minneapolis St. Paul & S.S. Marie Ry.Co. v. Moquin, 238 U.S. 520, 521, (1931) cited in Rozier v. Ford Motor Co., 573 F. 2d 1332 (5[th.Cir.] 6/5/1978), p. 10.

**The "Unpaid Refunds Finding Issue"**

Even when all the above issues are clearly in favor of IEU, this unpaid refunds issue serves to exemplify how perfidious the misrepresentations and/or fraudulent actions of the USDE attorneys have been. In terms of this specific issue, the actions of the USDE attorneys surpass by far, the misrepresentation and/or fraudulent actions already exposed so far herein.

1. First, the alleged "unpaid refunds" for the year 1994-95 were in-fact undoubtedly paid just as they were for all years before. The agency attorneys have failed to provide for an adequate explanation on why the "refunds" for the years 1992-1993 and 1993-1994 were deemed as paid late with a resulting imputation of mere interests as liabilities and why a disparate treatment was given to the same issue for the year 1994-95. See the overwhelming "smoking gun" evidence of the disparate treatment regarding this issue in particular in exhibit # 1. The "unpaid refunds" were paid by way of a direct debit to IEU's funds authorization first, and by way of a direct debit to the funds available second, at IEU's account under the USDE's total control. This, as a result IEU having re-processed the payment vouchers (in the defendants' possession) of all the refund students with their corresponding adjustment or debit from the originally requested to be paid amount per each student. The way it was supposed to be done.

The AIC's and the agency's attorneys, have continuously and consistently committed misrepresentation and/or fraud upon the courts, since the "smoking gun" evidence, emanating from official USDE documents, demonstrate again, that the refunds were paid, regardless that some of them were admittedly paid late.

2. Second, the evidence submitted in the instant case proves without doubt, not only that the "unpaid refunds" were paid, but it proves: when, for how much, with the specific social security number of each student whose refund was involved, the date, their names, the amount refunded, the specific batch number of the Institutional Payment Number (IPS) through which each one was processed and in brief, all the data that any reviewing court may need to corroborate that IEU's claims and defenses in support, both quantitatively and qualitatively, repudiate the agency's findings. Actually, a review of the data timely produced by the plaintiffs demonstrate without a doubt, not only that almost all of them were paid, but that the data provided by the plaintiffs to the USDE-IRB's auditor Lugo, can be easily corroborated to have been 99.37% accurate, in terms of what was represented to the auditor back at the time of the audit and what the official data in the official documents of the USDE serve to validate.

The misrepresentation and/or fraud upon the plaintiffs and the courts in regards to this issue lie in the following:

1. The lack of evidence in the part of the agency contrary to the one presented herein. The Court, upon giving  due consideration to this motion, shall not overlook the fact that the defendants did not produce evidence to counter, much less to persuade it against the overwhelming evidence in support of IEU's position in this matter.

2. The fact that AIC Lugo evidently committed perjury. The Defendants have not controverted or disputed this genuine issue of material fact, but they did not address the issue before the Court, nor could they, simply because they have been caught off-guard in terms of it.

3. There is no probable or possible way that the defendants could have proved before their ALJ nor can they with this Court, that IEU did not pay the viciously imputed "unpaid refunds.

**The Suborn Perjury, Perjury, Intimidation of Witness and Obstruction of Justice by the USDE attorneys.**

1. The evidence presented herein demonstrate, without any doubt, that in addition to the obstruction of justice, the defendant's attorneys, went a little further by suborning the perjury of IRB-AIC Felix Lugo. (See Exhibit # 1).

2. The intimidation of witnesses came about when the USDE-OGC attorneys telephone-called the pre-announced witnesses by the then appearing for the plaintiffs, Angel Ruiz Rivera (ARR), Pro Se and for IEU, obviously and evidently to deter their testimony in the administrative hearings. Since plaintiffs were not represented by retained counsel, the USDE attorneys obviously took advantage of this in view of ARR's virtual defenselessness since he did not have any previous experience litigating. See Exhibit # 23, where this allegation is proven beyond doubt as a result of the incomprehensible confession for the record of USDE attorney Russell Wolff, Esq..

This intimidation of witnesses was confessed for the record when as a reaction to the plaintiffs' *ad hoc* counsel for the hearings, (Benny Frankie Cerezo, Esq.) timely objection and

denunciation of this fact at the start of the first day of hearings. Attorney Wolff was so boastfully

arrogant, that he admitted it for the record. See <u>Shepherd v. American Broadcasting Co.</u>, D.C.

Circuit, 94-7141, 8/28/95.

> **"Yes. In fact the functionary that counsel (referring to BFC), is referring to is my**
> **co-counsel (referring to Ms. Alexandra Gil-Montero, Esq.) who specifically did**
> **knowingly, in my presence, properly contact two independent public accountants**
> **who appeared on a witness list that Respondent presented to both the Department**
> **and to this Tribunal**.
>
> **It would had been improper (sic) for the Department not to contact these**
> **individuals who are to appear before this Tribunal as witnesses, and request**
> **opportunity to speak with them.**
>
> Clearly the Department did not contact the school, the school officials, anybody that
> counsel would be representing. We would not contact respondent.
>
> Similarly we would not allow them to contact someone that we purported as our client,
> for purposes he described to us.
>
> But an independent public accountant has a duty to talk to the Department, as our
> regulations specifically say. It's the duty to present its work papers for our evaluation.
> **And certainly, not only was it not improper, but it was necessary that the**
> **Department contact these two individuals."** (Emphasis added). <u>Exhibit # 24</u>.

3. This intimidation of witnesses, a patent violation of the Civil Rights, 42 U.S.C. section 1985,

proved to be profitable to the defendants inasmuch the Senior Partner Vicente Leon, of external

auditor, C.P.A. firm, KPMG Peat Marwick, shied away from his professional obligation to

defend his firms' audit. The fact that the USDE was a major client of KPMG with many millions

of dollars in payments for services involved, most probably acted as a catalytic agent of Wolff's

and Gil Montero's intimidation of pre-announced witness C.P.A. Vicente Leon.

In conclusion, all the above strongly reiterated claims, supported with all the evidence

included herein demonstrate that this case was adjudged based on mistakes, misrepresentation

and/or fraud, all of which the FRCP 60 (b) prescribes that relief may be ordered.

Of all of the above serious violations by the denounced federal officers, most particularly the attorneys involved, it is difficult to determine which was worse than the other or which one was committed with more bad faith, opprobrium and perfidy. In this vein, the following applicable and controlling precedent should be taken into consideration by the Court. From Hull v Municipality of San Juan, cited supra, we respectfully quote.

> "We find no clear error in the district court's finding that Andrew's fraud was proved by clear and convincing evidence. …**But the information withheld was too patent and too convenient, and the pattern of deceit and grudging concessions too marked, to excuse the misstatements and omissions as merely careless.[29] The next question is whether a district court has power to dismiss a complaint because the plaintiff lies substantially and materially in the course of discovery. In our own circuit, fraud--at least of a kind sometimes called "fraud on the court" \*fn2 --is a potential basis for dismissing a claim on the facts where[30] a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.**" Id at [28].
>
> Aoude, 892 F.2d at 1118-19. **There is similar case law in other circuits.** Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1476-78 (D.C. Cir. 1995); Wyle v. R.J. Reynolds Indus., 709 F.2d 585, 589 (9th Cir. 1983) Ibid at [31] …The same conduct might not necessarily be enough to reopen a final judgment after one year, Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 47-49 (1st Cir. 1995), but finality of long-standing judgments is a different matter than dismissal of a current complaint…Id at [32].

Therefore, IEU respectfully request that this Court call a hearing based on the evident misrepresentation and/or fraud regarding this and the other issues, in case it does not grants summary judgment for the plaintiffs in view of all the evidence included herein. The least that IEU prays for under the circumstances of this case is to have a modicum of discovery and an evidentiary hearing to allow the defendants' to bring their "best foot forward" and dispense us the same equal treatment. In the alternative, IEU pray for the appointment of a special master (FRCP 53 et seq.) to find out from the KPMG and VGM's C.P.A. firms external audits *vis a vis*

33

the USDE-OIG audit of IEU, which excess cash amount is the correct one so that it may submit

recommendations to the Court regarding this issue. This is an issue that by its nature makes it

amenable for a special master.

In sum, in view of the evidently contumacious and egregious conduct of the defendants

here, plaintiffs pray that this Court not only grants this motion but that it grants default judgment

or in the alternative summary judgment for IEU, according to the following applicable and

controlling precedent which is presented in support. Dixon v. Commissioner of Internal Revenue

Service, No.00-70858 (9[th.Cir]. 1/17/2003), which held that:

"[40] [1] **Courts possess the inherent power to vacate or amend a judgment obtained by fraud on the court,** Toscano v. CIR, 441 F.2d 930, 933 (9th Cir. 1971), ...**applying only to fraud that defiles the court or is perpetrated by officers of the court. When we conclude that the integrity of the judicial process has been harmed, however, and the fraud rises to the level of "an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,"** we not only can act, we should. England, 281 F.2d at 309; Levander v. Prober, 180 F.3d 1114, 1119 (9th Cir. 1999); Intermagnetics Am., Inc. v. China Int'l Trust and Inv. Corp., 926 F.2d 912, 916-17 (9th Cir. 1991).[42] [3] **Prejudice is not an element of fraud on the court.** HazelAtlas, 322 U.S. at 238; Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1132-33 (9th Cir. 1995). *fn9 **Fraud on the court occurs when the misconduct harms the integrity of the judicial process, regardless of whether the opposing party is prejudiced.** Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989). **Furthermore, the perpetrator of the fraud should not be allowed to dispute the effectiveness of the fraud after the fact.** Hazel Atlas, 322 U.S. at 247; Pumphrey, 62 F.3d at 1133. ...[43] [4] As the Supreme Court observed more than fifty years ago, "[t]ruth needs no disguise." Hazel-Atlas, 322 U.S. at 247. ... the proceeding was a charade fraught with concealed motives, hidden payments, and false testimony. **What did occur was clearly designed to defile the court itself, and there is no question that it was carried out by an officer of the court.** Toscano, 441 F.2d at 933. **Such fraud corrupts the adversarial nature of the proceeding, the integrity of witnesses, and the ability of the trial court to judge impartially.** See England, 281 F.2d 304. **This harm is noteworthy not only because it defiled the sanctity of the court and the confidence of all future litigants,** but also because it violated the rights of the test case petitioners and the more than 1,300 taxpayers who agreed to be bound by the outcome of the Tax Court proceeding. See Levander, 180 F.3d at 1118 ("**[T]ampering with the administration of justice in this manner involves far more than an injury to a single litigant. It is a wrong against**

**the institutions set up to protect and safeguard the public**."). As such, the taxpayers have clearly and convincingly demonstrated fraud on the court and are entitled to relief. (Emphasis ours. In this case, 5,000 students and 500 employees were negatively affected by the actions denounced, note ours)

WHEREFORE, for all the reasons stated above the plaintiff, Instituto de Educacion

Universal, very respectfully requests that this Honorable Court grants this motion for relief from

judgment as authorized by FRCP 60(b).

Respectfully submitted, in San Juan, P.R., today October 25, 2005.

Julio Morillo Limardo, Esq.
USDC No. 130811
Avenida Betances I-17
Bayamon, P.R. 00959.
787-485-5437

### Certificate of Service

I, Julio Morillo Limardo, Esq., appearing for Co-Plantiff IEU, hereby certify that a copy of this Motion was served through priority mail of the U.S. Postal Service to the appearing counsel for the Defendant, Ms. Isabel Munoz Acosta, Esq., U.S. Attorney's Office for the District of Puerto Rico, Civil Division, Plaza Chardon Suite 1201, 350 Chardon Ave. Hato Rey, P.R. 00918 and to Angel Ruiz Rivera, appearing Pro Se as Co-Plaintiff on his own right.

EXHIBITS

1. Evidence of the perjury by the USDE-IRB-AIC Felix Lugo.

a. Detailed breakdown of all the Pell Grant payment vouchers processed and reprocessed during the years 1992-1995, indicating the net refunds paid.

b. List of all the 512 refunds honestly reported by IEU on April 28, 1995 in the Program Review, falsely and fraudulently imputed by Lugo and the USDE attorneys as unpaid.

c. List of all the 512 Refunds imputed in Lugo's Program Review, in alphabetical order, with each Institutional Payment Summary (IPS) Batch Number and Date and specific cross reference to the Pell Grant Student Payment Summary.

d. List of all the 512 Refunds imputed in Lugo's Program Review, in the exact order of the original list provided, which follows each List, with each Institutional Payment Summary (IPS) Batch Number and Date and specific cross reference to the Pell Grant Student Payment Summary.

e. List of all the Pell Grant Statement of Account issued by the USDE for IEU corresponding to the 1994-95 year.

f. List of the specific Pell Grant Batch Reports for 1994-95 involved in the $1,120,192 debited as a result of the reprocessing of the payment vouchers through which the refunds were paid through debit to the authorization and to the funds in IEU account at the USDE.

g. Pell Grant Program Statement of Account of 1994-95, showing the $1,120,192, debited on July 1995 as a direct result of the reprocessing of the payment vouchers shown in the Batch Reports included above in Exhibit 1g.

h. ED RECIPIENT ACCOUNT BALANCE AND PAYMENT HISTORY of July 18 and July

36

21, 1995, which show the debit from IEU's account of the $1,120,192 previously debited from its

Pell Grant funds authorization in its Statement of Account, as the direct result of the reprocessing

of the payment vouchers shown above, whereby the refunds were paid, (those imputed and still

others not imputed.

i. Pertinent excerpts of the administrative hearing transcript of October 22, 1996, where the

USDE attorneys suborned the perjury of Lugo who committed perjury as proven by the evidence

above.

2. San Juan City College (SJCC) and Americo Reyes v. United States, 03-5180, U.S. Court of

Appeals for the Federal Circuit, (12/9/2004).

3. Evidence of the indictment of Mr. Fidel Alonso Vals, the President -Founder of IBC, in

criminal case 3:02-cr-00042-HL

4. Pertinent excerpt of the OIG Draft Report of July 1995 at p.4.

5. Pertinent excerpt of the OIG Audit Report of September 1995 at p.5-6.

6. Transcript of the October 22, 1996, administrative hearing, at p. 178.

7. USDE-OIG  June 28, 1996 Final Audit Determination (FAD) at p.3.

8. In The Matter of Instituto de Educacion Universal , Docket No. 96-28 ST; 96-93-SP; 96-103-

SA.

9. USDE-OGC legal opinion by Mr. Fred Marinucci, Esq., entitled "Note to Clifton Knight, IRB:

Re: Measurement of non-standard class sessions in clock hours". (Per Clifton's request as the

USDE's Chief Auditor of the IRB).

10. The IRB's Chief Auditor Knight Memorandum of the Division of Audit and Program

Review.

11. In The Matter Of Denver Paralegal Institute, 92-86-SP and 92-87-SA.

12. In The Matter Of MBTI (93-147-SA).

13. SFAP's December 20,1996 Post Hearing Brief at p. 16, ¶3. "However, these cases interpret

the definition of a clock hour before regulatory change..." (Underlined in the original).

14. Instances at this case where the USDE reiterated their above misrepresentation and/or fraud.

This fraudulent misrepresentation to the ALJ was repeated to this Court by the USDE attorneys

in their motions in the instant case.

15. Excerpt from Nater's record proceedings at the USMSPB entitled "Specific Observations".

16. Excerpt from  Nater's record proceedings at the USMSPB, where it states that: " **The Team**

**indicated that sufficient, competent and relevant evidence in support of finding #1 was not**

**obtained. They commented that: ..."the work papers did not provide sufficient evidence to**

**convince a cold reviewer that the school (sic) violated the spirit of the regulations**."

17. Final Decision of the Secretary of October 28, 1997, affirmed on January 8, 1998.

18. Letter of Termination of Eligibility to the Plaintiffs of March 12, 1996 Letter of Termination

of Eligibility to the Plaintiffs of March 12, 1996.

19. Excerpt form Nater's work papers regarding the excess cash finding as written by himself in

his report.

20. U.S. Attorney, in the USDE's Motion for Summary Judgment of September 1996 in the

previous case 96-1893 (JAF), at p.9.

21. Statement of Contested Facts, page  , Exhibit 21.

22. "... the average monthly excess cash is not computed in the same manner as the monthly

average of total funds." See Response Brief of the SFAP's of April 4, 1997, at p. 5, ¶ 1.

23. Confession for the record of USDE attorney Russell Wolff, Esq. of the USDE's intimidation of the plaintiffs' witnesses.

24. OIG Report to Congress